# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MITCHELL BARNES-WALLACE;
MAXWELL BREEN,
        *Plaintiffs-Appellees,*

        v.

CITY OF SAN DIEGO,
        *Defendant,*

        and

BOY SCOUTS OF AMERICA - DESERT
PACIFIC COUNCIL,
        *Defendant-Appellant.*

No. 04-55732

D.C. No.
CV-00-01726-
NAJ/AJB

MITCHELL BARNES-WALLACE;
MAXWELL BREEN; LORI BARNES-
WALLACE, Guardian Ad Litem;
LYNN BARNES-WALLACE, Guardian
Ad Litem; MICHAEL BREEN,
Guardian Ad Litem; VALERIE
BREEN, Guardian Ad Litem,
        *Plaintiffs-Appellants,*

        v.

CITY OF SAN DIEGO; BOY SCOUTS OF
AMERICA - DESERT PACIFIC
COUNCIL,
        *Defendants-Appellees.*

No. 04-56167

D.C. No.
CV-00-01726-
NAJ/AJB

ORDER
CERTIFYING
QUESTIONS TO
THE SUPREME
COURT OF
CALIFORNIA

Filed June 11, 2008

Before: William C. Canby, Jr., Andrew J. Kleinfeld, and
Marsha S. Berzon, Circuit Judges.

6587

Order;
Concurrence by Judge Berzon;
Dissent by Judge Kleinfeld

## ORDER

We respectfully request the California Supreme Court to exercise its discretion and decide the certified questions presented below. *See* Cal. R. Ct. 8.548. The resolution of any one of these questions could determine the outcome of this appeal and no controlling California precedent exists. *See id.* We are aware of the California Supreme Court's demanding caseload and recognize that our request adds to that load. But we feel compelled to request certification because this case raises difficult questions of state constitutional law with potentially broad implications for California citizens' civil and religious liberties. Considerations of comity and federalism favor the resolution of such questions by the State's highest court rather than this court.

## I.    Questions Certified

The Desert Pacific Council, a nonprofit corporation chartered by the Boy Scouts of America, leases land from the City of San Diego in Balboa Park and Mission Bay Park. The Council pays no rent for the Mission Bay property and one dollar per year in rent for the Balboa Park property. In return, the Council operates Balboa Park's campground and Mission Bay Park's Youth Aquatic Center. The campground and the Aquatic Center are public facilities, but the Council maintains its headquarters on the campground, and its members extensively use both facilities. The Boy Scouts of America — and in turn the Council — prohibit atheists, agnostics, and homosexuals from being members or volunteers and require members to affirm a belief in God.

The plaintiffs are users of the two Parks who are, respectively, lesbians and agnostics. They would use the land or facilities leased by the Desert Pacific Council but for the Council's and Boy Scouts' discriminatory policies.

We certify to the California Supreme Court the following questions:

1.  Do the leases interfere with the free exercise and enjoyment of religion by granting preference for a religious organization in violation of the No Preference Clause in article I, section 4 of the California Constitution?

2.  Are the leases "aid" for purposes of the No Aid Clause of article XVI, section 5 of the California Constitution?

3.  If the leases are aid, are they benefitting a "creed" or "sectarian purpose" in violation of the No Aid Clause?

The California Supreme Court is not bound by this court's presentation of the questions. We will accept a reformulation of the questions and will accept the Supreme Court's decision. To aid the Supreme Court in deciding whether to accept the certification, we provide the following statement of facts, jurisdictional analysis, and explanation.

## II.   Statement of Facts

Because the district court granted summary judgment against it, we take the facts in the light most favorable to the non-moving party, the Desert Pacific Council. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

### A.   The Parties

The Desert Pacific Council (the "Council") is a nonprofit corporation chartered by The Boy Scouts of America to administer Scouting programs in the San Diego area. Con-

gress chartered the Boy Scouts of America "to promote . . . the ability of boys to do things for themselves and others . . . and to teach them patriotism, courage, self-reliance, and kindred virtues." 36 U.S.C. § 30902 (2006). While Scouting focuses primarily on outdoor activity, the Boy Scouts' rules include a prohibition against allowing youths or adults who are atheists, agnostics, or homosexuals to be members or volunteers. *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659-61 (2000) (holding that the Boy Scouts have a constitutional right to exclude homosexuals). These rules bind the Council. The Boy Scouts maintain that agnosticism, atheism, and homosexuality are inconsistent with their goals and with the obligations of their members. *See Randall v. Orange County Council, Boy Scouts of Am.*, 17 Cal. 4th 736, 742 (1998) (reciting that, in defending its right to exclude atheists, the Boy Scouts introduced "evidence intended to establish that requiring the inclusion of nonbelievers . . . would interfere with the organization's efforts to convey its religious message").

The Boy Scouts do not require scouts to affiliate with any religious organization, and the Boy Scouts style themselves "absolutely nonsectarian." [ER 309 (75:7-8), 1580, art. IX § 1, cl. 1; *see also, e.g.*, ER 1527; ER 54 ¶ 185, ER 2007 ¶ 185.][1] The San Diego Boy Scouts are "not a house of worship like a church or synagogue." [ER 54 ¶ 185; ER 2007 ¶ 185.] Still, the organization has a religious element. All members and volunteers take an oath to "do my best . . . [t]o do my duty to God and my country" and to remain "morally straight." [ER 2005 ¶ 176.] The organization's mission is "to prepare young people to make ethical choices over their lifetimes by instilling in them the values of the Scout Oath and Law." [ER

---

[1]The bracketed citations of ER and SER refer, respectively, to the Excerpts of Record and the Supplemental Excerpts of Record filed by the parties in this court. The references are included in this Order for the convenience of the California Supreme Court, should it choose to request this court to furnish those Excerpts. *See* Cal. R. Ct. 8.548(c).

2003 ¶ 162.] Duty to God is placed first in the Oath as "the most important of all Scouting values." [ER 2004 ¶ 170.] Members also must agree to uphold the "Scout Law," which provides that a Scout is "faithful in his religious duties." [ER 2005 ¶ 177.] Membership and leadership applications contain a "Declaration of Religious Principle," which explains that "no member can grow into the best kind of citizen without recognizing an obligation to God." [ER 1535.] The Boy Scouts instruct leaders to "be positive in their religious influence and [to] encourage Scouts to earn the religious emblem of their faith." [ER 1527.]

The plaintiffs Barnes-Wallaces are a lesbian couple and the plaintiffs Breens are agnostics. Because of their sexual and religious orientations, they cannot be Boy Scout volunteers. Both couples have sons old enough to join the Boy Scouts, and they would like their sons to use the leased facilities, but the parents refuse to give the approval required for membership. As part of the membership application, a parent must promise to assist his or her son "in observing the policies of the Boy Scouts of America . . . [to] serve as his adult partner and participate in all meetings and approve his advancement." [*Id.* 1533.] The application also includes the Scout Law and the Declaration of Religious Principle. The Barnes-Wallaces and the Breens believe that the Boy Scouts' policies are discriminatory, and they refuse to condone such practices by allowing their children to join the Boy Scouts.

## B.   The Leases

In accord with its long history of "encourag[ing] nonprofit organizations to develop cultural, educational, and recreational programs" on the City property, the plaintiffs' home town of San Diego has leased 123 public properties to various nonprofit organizations.[2] [SER 10, 36.] One of these organiza-

---

[2]These organizations include religious organizations (e.g., San Diego Calvary Korean Church, Point Loma Community Presbyterian Church,

tions is the Desert Pacific Council, which leases, occupies, and operates portions of two popular city parks. Other portions of those parks are extensively used by the plaintiff families. Under the original lease, the Council paid one dollar per year in rent. In 2002 the parties entered into a new twenty-five-year lease, which requires the Desert Pacific Council to pay one dollar in annual rent and a $2,500 annual administration fee.

The City negotiated this lease with the Council on an exclusive basis, as it sometimes does with groups, religious or secular, that it deems to be appropriate operators of a particular piece of City property. [ER 843-44, 850 (132:8-23); SER 433-34, 592 (135:7-20), 1168, 1172-73, 1175, 1182-83, 1185-86, 1189.] Other organizations receive similar terms. Some ninety-six of the City's leases to non-profits (including nineteen leases to youth-oriented recreational non-profits) require no rent or rent less than the $2,500 fee the Council pays, and fifty of them have terms twenty-five years or longer. [SER 12-15, 27-29.] Although they produce little to no revenue, these leases save the City some money by placing the costs of maintenance and improvement upon the lessee organizations. [SER 204-05.] The City spends nothing on the properties leased to the Council. [SER 3 ¶ 9, 5 ¶ 17.]

The Council leases from the City sixteen acres in Balboa Park known as Camp Balboa. Camp Balboa offers a "unique" urban camping opportunity in the "heart of the City." [ER 1966 ¶ 7.] The site includes campgrounds, a swimming pool, an amphitheater, a program lodge, a picnic area, a ham radio room, restrooms and showers, and a camp ranger office. The

---

Jewish Community Center, Salvation Army), organizations concerned with children or the elderly (e.g., Camp Fire, Girl Scouts, ElderHelp, Little League), organizations that limit their membership or services on the basis of race or ethnicity (e.g., Vietnamese Federation of San Diego, Black Police Officers Association), and art museums and similar institutions (e.g., San Diego Art Institute, Old Globe Theater) [SER 11, 14, 27-29].

lease requires the Council to maintain the property and to expend at least $1.7 million for capital improvements over seven years. [ER 820.] The Boy Scouts have landscaped, constructed recreational facilities, and installed water and power on the property. [SER 217 ¶ 17.]

Similarly, under the Fiesta Island lease, the Boy Scouts spent approximately $2.5 million to build the Youth Aquatic Center [SER 215 ¶ 10, 1084 ¶ 19]. The facility offers the use of kayaks, canoes, sail and row boats, and classroom space to other youth groups at inexpensive rates. [SER 215-16 ¶¶ 10-11.]

## C.   Occupancy of the Land

The Desert Pacific Council makes exclusive use of portions of Balboa Park for its own benefit. The Council has its headquarters on park property. From this facility it oversees its $3.7 million budget, manages its thirty employees, and processes applications for membership and leadership positions. The Council also has a print shop on park land that it uses to print literature for its members. These portions of the park are unavailable for public use.

Other portions of Camp Balboa and the Youth Aquatic Center are available for use by non-member groups, but the Council manages reservations of these recreational facilities. Campsites at Camp Balboa are available on a first-come, first-served basis. [SER 295, 307, 617-18.] Thus, if the plaintiffs were to use the land, they would have to do so subject to the Council's oversight. The Council can declare the camp "closed," determine how many people are going to attend the camps, and then open up only the unreserved facilities to the public. Nonetheless, numerous other groups have camped in the campsites while camp was in session, and the San Diego Boy Scouts have not turned any non-Scout group away from Camp Balboa during that time. [SER 291 (171:3-6); *see also* SER 624 (156:16-157:16); 291 (170:13-15)]. The Camp

charges a small fee for camping, but the revenue from fees is insufficient to cover the cost of maintaining the camp facilities. [SER 218].

The Council also leases land from the City on Fiesta Island in Mission Bay Park. In 1987, the City entered into a twenty five-year, rent-free lease with the Desert Pacific Council for one-half acre of waterfront property on Fiesta Island. The City entered into this lease after the Desert Pacific Council approached it about building and operating an aquatic center on the island. The Council was awarded the lease on the condition that it expend $1.5 million to build the Youth Aquatic Center. At a price of about $2.5 million [SER 1084 ¶ 19], the Council built and now operates the Aquatic Center, which offers boating, sailing, canoeing, and kayaking to San Diego youth.

As at Camp Balboa, reservations to use the Youth Aquatic Center are made through the Council. The Aquatic Center has a formal first-come, first-served policy, but the policy has exceptions for Scout members. The Desert Pacific Council is permitted to reserve up to 75% of the facilities seven days in advance. The Council also hosts a members-only camp for four weeks each summer. The reservation books during camp say "YAC Closed for Summer Camp," although the Boy Scouts' use of the Aquatic Center during those weeks is not exclusive. [SER 216-17, 317.] While the public cannot use the Aquatic Center during summer camp for water-based activities, it can reserve dormitories or other facilities the Scouts are not using. In practice, non-members often use portions of the facilities more than members do. [SER 216-18.] The San Diego Boy Scouts have not turned away any non-Scout group while Scouting is in session, either at Camp Balboa or at the Aquatic Center. [SER 291 (170:13-15, 171:3-6), 315 (227:11-14).] The Center charges fees for use, but there is no evidence that the fees equal or exceed the cost of maintaining the facilities.

There are no religious symbols either at Camp Balboa or at the Youth Aquatic Center.

## D.   The Plaintiffs' Injury

The plaintiffs never applied to use the Youth Aquatic Center or Camp Balboa; there is no evidence that the Council actively excluded them. [SER 235-36 (104:24-106:10), 244 (91:25-93:23), 251-52 (33:2-35:10).] Rather, they testified that the Council's occupation and control of the land deterred them from using the land at all. The plaintiffs desired to make use of the recreational facilities at Camp Balboa and the Youth Aquatic Center, but not under the Council's authority. As a result, they actively avoided the land. They refused to condone the Boy Scouts' exclusionary policies by seeking permission from the Boy Scouts to use the leased facilities or by using the leased facilities subject to the Boy Scouts' ownership and control. [ER 85, 370-71; SER 252 (35:12-15; 36:2-5).] They had an aversion to the facilities and felt unwelcome there because of the Boy Scouts' policies that discriminated against people like them. [ER 369; SER 254 (74:4-10)].

The plaintiff families brought this action against the City of San Diego, the Boy Scouts, and the Desert Pacific Council, alleging that leasing public land to an organization that excludes persons because of their religious and sexual orientations violates the federal Establishment Clause, the California Constitution's No Preference[3] and No Aid[4] Clauses, the fed-

---

[3]This Clause provides, in relevant part:

Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion.

Cal. Const. art. I, sec. 4.

[4]This Clause states:

eral and state Equal Protection Clauses, the San Diego Human Dignity Ordinance, and state contract law. The district court found the plaintiffs had standing as municipal taxpayers and then allowed them to file an amended complaint. Both parties sought summary judgment. The court found that the leases violated the federal Establishment Clause and the California No Aid and No Preference Clauses and granted summary judgment in the plaintiffs' favor. *Barnes-Wallace v. Boy Scouts of Am.*, 275 F. Supp. 2d 1259, 1276-80 (S.D. Cal. 2003). In the amended final judgment, the court enjoined the Balboa Park and Fiesta Island leases. The City then notified the Council that under the terms of the 2002 Balboa Park lease, the term tenancy was terminated and converted to a month-to-month tenancy. The plaintiffs have since settled with the City. The Scout defendants appealed the district court's ruling.

## III.   Jurisdictional Analysis

Before proceeding further, we must satisfy ourselves that we have jurisdiction over this appeal. We have statutory jurisdiction over the appeal under 28 U.S.C. § 1291, but the parties have presented challenges to the existence of a case or controversy that is essential to our constitutional jurisdiction under Article III. *See Harrison W. Corp. v. United States*, 792 F.2d 1391, 1392 (9th Cir. 1986). We address these issues as threshold matters.

### A.   Mootness

The plaintiffs argue that the appeal is moot as to the Balboa Park lease because the City terminated the lease after the dis-

---

Neither the legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose . . . .

Cal. Const. art. XVI, sec. 5.

trict court's final judgment. The appeal is not moot because the Desert Pacific Council still has "a legally cognizable interest for which the courts can grant a remedy." *Alaska Ctr. for the Env't v. U.S. Forest Service*, 189 F.3d 851, 854 (9th Cir. 1999). The City did not terminate the Desert Pacific Council's tenancy, but rather converted it to a month-to-month, holdover tenancy. The Council still occupies Camp Balboa, and the permissibility of its tenancy remains at issue in this appeal. Moreover, the City's notice terminating the lease indicated that, if the district court's judgment is reversed, the termination notice will be of no effect. The controversy with regard to the Balboa Park lease is not moot.

## B.  Standing

The Boy Scouts challenge the standing of plaintiffs to bring this action. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (explaining that standing is a component of the case-or-controversy requirement). Because the case was decided on summary judgment in the district court, the plaintiffs had the burden of showing by uncontroverted facts that they had standing to challenge the leases. *See id.* at 561. We conclude that the plaintiffs have sustained that burden, but we base standing on a different ground from that adopted by the district court.

The Barnes-Wallaces and the Breens have standing to pursue their claims because uncontroverted evidence shows that they suffered injury-in-fact traceable to the Scout defendants' conduct, and that a favorable decision is likely to redress their injuries. *See Lujan*, 504 U.S. at 560-61. The Barnes-Wallaces and the Breens submitted declarations asserting, without contradiction by the Scout defendants, that they would like to use Camp Balboa and the Aquatic Center, but that they avoid doing so because they are offended by the Boy Scouts' exclusion, and publicly expressed disapproval, of lesbians, atheists and agnostics. The plaintiffs also object to the Boy Scouts' control of access to the facilities, noting that their use of the

land would require "go[ing] through" the Boy Scouts and passing by symbols of its presence and dominion.

We have held that comparable restrictions on plaintiffs' use of land constitute redressable injuries for the purposes of Article III standing. Our Establishment Clause cases have recognized an injury-in-fact when a religious display causes an individual such distress that she can no longer enjoy the land on which the display is situated. In *Buono v. Norton*, the plaintiff, a practicing Roman Catholic, was so offended by the "establishment" of a cross on public land that he avoided passing through or visiting the land. 371 F.3d 543, 546-47 (9th Cir. 2004). We concluded that Buono's "inability to unreservedly use public land" constituted an injury-in-fact, reasoning that Buono's avoidance of the land was a personal injury suffered "*as a consequence* of the alleged constitutional error." *Id*. at 547 (internal quotation marks omitted); *see also Ellis v. La Mesa*, 990 F.2d 1518, 1523 (9th Cir. 1993) (finding standing where plaintiffs avoided using land on which cross was displayed).

Similarly, the Breens and Barnes-Wallaces have avoided Camp Balboa and the Aquatic Center because they object to the Boy Scouts' presence on, and control of, the land: They do not want to view signs posted by the Boy Scouts or interact with the Boy Scouts' representatives in order to gain access to the facilities. As in *Buono*, they have alleged injuries beyond "the psychological consequence presumably produced by observation of conduct with which [they] disagree[ ]," because their inhibition interferes with their personal use of the land. *Valley Forge Christian Coll. v. Am. United for Separation of Church & State*, 454 U.S. 464, 485 (1982). Indeed, the plaintiffs' emotional injuries are stronger than those of the Catholic plaintiff in *Buono*, because they belong to the very groups excluded and disapproved of by the Boy Scouts, and because they would be confronted with symbols of the Boy Scouts' belief system if they used or attempted to gain access to Balboa Park and the Aquatic Center.

We also have found standing, in environmental cases, when plaintiffs' enjoyment of land would suffer because of treatment of the land or events occurring on the land. *See Alaska Wildlife Alliance v. Jensen*, 108 F.3d 1065, 1068 (9th Cir. 1997) (plaintiffs "demonstrate aesthetic and recreational harm that will support standing" when noise, trash, and wakes of vessels in national park diminished plaintiffs' enjoyment of the land); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860 (9th Cir. 2005) (holding that plaintiff organization suffered injury from increased risk of oil spill that would impair its aesthetic or recreational enjoyment of a stretch of Alaskan coastline). The plaintiffs' enjoyment of the Council-operated facilities is similarly threatened by the Boy Scouts' presence and activities. The plaintiffs are faced with the choice of not using Camp Balboa and the Aquatic Center, which they wish to use, or making their family excursions under the dominion of an organization that openly rejects their beliefs and sexual orientation. This is not a case where the plaintiffs have no plan to use the land in question. *See Lujan*, 504 U.S. at 564 (requiring "concrete plans" to visit place of environmental harm for a finding of actual and imminent injury). The plaintiffs accordingly have alleged a concrete recreational loss.

We conclude that, even with the facts construed favorably to the Scout defendants, the plaintiffs have shown both personal emotional harm and the loss of recreational enjoyment, resulting from the Boy Scouts' use and control of Camp Balboa and the Aquatic Center. These injuries, which are likely to be redressed by a favorable decision, satisfy the standing requirements of Article III of the Constitution.

The Scout defendants argue that, as in *Valley Forge*, the plaintiffs' alleged injuries are based on abstract "feelings" and "beliefs" about the Boy Scouts, and therefore are inadequate to confer standing. We conclude that *Valley Forge* does not control this case. The *Valley Forge* plaintiffs, who resided in Maryland and Virginia, learned through a news release of a

transfer of federal land in Pennsylvania to a sectarian college. They attempted to challenge the transfer in federal court. *Valley Forge*, 454 U.S. at 487. They did not purport to have an interest in using the land at issue. *See id*. at 486 ("We simply cannot see that respondents have alleged an *injury* of *any* kind, economic or otherwise, sufficient to confer standing.") (emphasis in original). In contrast, the Breens and Barnes-Wallaces reside in San Diego, where Camp Balboa and the Aquatic Park are located, and have expressed a desire to make personal use of the facilities operated by the Council. They can hardly be characterized as individuals who "roam the country in search of governmental wrongdoing." *Id*. at 487; *see also Allen v. Wright*, 468 U.S. 737, 755-56 (1984).[5] Moreover, the plaintiffs here are lesbians and agnostics, members of the classes of individuals excluded and publicly disapproved of by the Boy Scouts. They are not bystanders expressing ideological disapproval of the government's conduct. The plaintiffs' personal interest in the land at issue, and the personal nature of their objection to the Scout defendants' use of the land, take this case outside of the scope of *Valley Forge*.[6]

---

[5]In *Allen*, the Supreme Court held that a stigmatic injury caused by racial discrimination could support standing only if the plaintiffs personally had been or were likely to be subject to the challenged discrimination. *Allen*, 468 U.S. at 755-56. The injury of which the Barnes-Wallaces and Breens complain is the offensiveness of having to deal with the Boy Scouts in order to use park facilities that they wish to use, and would use, but for the control of the Boy Scouts over those facilities. We conclude that this injury is sufficiently immediate to these plaintiffs to permit standing under the rationale of *Allen*.

[6]The dissent to this order points out that we originally rejected this theory of standing on the ground that no obvious religious displays were present at the Camp or Aquatic Center. The majority of the panel concludes, however, that the earlier reasoning was incorrect. Psychological injury can be caused by symbols or activities other than large crosses. *See Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) (holding that stigma of discrimination confers standing even though remedy may confer no material benefit). Here, the psychological injury is generated primarily not by plaintiffs' own beliefs but by the Boy Scouts' disapproval of the plaintiffs and people

## C.   The Plaintiffs' Alternative Theories of Standing

We reject the plaintiffs' other theories of standing: the theory that they have standing as taxpayers and the theory that they suffered injury from the Council's policy of preferential access to the leased property. We disagree with the district court and conclude that the plaintiffs do not have standing as municipal taxpayers because they have not suffered a "direct dollars-and-cents injury." *Doremus v. Bd. of Educ. of Hawthorne*, 342 U.S. 429, 434 (1952). The plaintiffs characterize the nominal-rent leases as tax expenditures, but the Supreme Court recently made clear that a government's forgoing of revenue is not the equivalent of an expenditure. *Daimler-Chrysler Corp. v. Cuno*, 126 S. Ct. 1854, 1862 (2006).[7] The Court rested its holding in part on the fact that the plaintiff taxpayers' injury was not "actual or imminent" because the tax break—designed to stimulate the economy—would not necessarily lower government revenues. *Id.* at 1862. Similarly, this court has held that municipal taxpayers must show an expenditure of public funds to have standing. *Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 793-97 (9th Cir. 1999); *Cammack v. Waihee*, 932 F.2d 765, 770 (9th Cir. 1991). The plaintiffs' injury is not actual or imminent because it is unclear whether San Diego loses money by charging nominal rent but requiring lessees to maintain and improve the leased property.

The leases are more reasonably characterized as a potential loss of municipal revenues, but even this loss is not definite

---

like them. As *Buono* points out, the problem with standing in *Valley Forge* was not the nature of the psychological injury but "the absence of any personal injury at all." *Buono*, 371 F.3d at 547. A psychological injury that is generated by demeaning actions directed at the plaintiffs and that causes the plaintiff to avoid a public area that he wishes to use is sufficient to overcome that problem and confer standing. *See id.*

[7]The district court did not have the benefit of *DaimlerChrysler* at the time it ruled that the plaintiffs had taxpayer standing.

enough to create municipal taxpayer standing. There is no evidence that, if the leases were invalidated, the City would use the land to generate revenue. *See DaimlerChrysler,* 126 S. Ct. at 1862 (finding the plaintiff taxpayers' alleged injury too conjectural because it depended on legislators' responses to the tax breaks in question). For example, the City's Director of Real Estate testified that "[t]he City would likely seek another lessee to operate a recreational facility . . . under similar terms and conditions in the existing [Youth Aquatic Center] lease . . . [because the] City Council has never had a policy of using the [Youth Aquatic Center] property in a manner that maximizes the revenue that potentially could be generated by this site." [SER 4 ¶ 12.] More generally, the Director stated that "the City has not historically sought to obtain market rent from nonprofit lessees of dedicated parkland." Without a definite expenditure of municipal funds, plaintiffs do not have standing as municipal taxpayers. *DaimlerChrysler*, 126 S. Ct. at 1862; *Cammack*, 932 F.2d at 770-71.

Nor can the plaintiffs claim standing on the basis of the Council's policy of granting preferential access to the Boy Scouts. Even if the Council excludes other groups in favor of Boy Scouts—a disputed fact here—the plaintiffs cannot show injury from this policy. The plaintiffs have insisted that they would not use the facilities while the Boy Scouts are lessees. The plaintiffs never contacted the Boy Scouts about using the facilities, and they admitted they knew little or nothing about the Boy Scouts' policies regarding access to the facilities. Without any plans to apply for access, the plaintiffs cannot show actual and imminent injury from a discriminatory policy of denying access. *See Lujan*, 504 U.S. at 564.

Moreover, the injury that we have concluded the plaintiffs *did* suffer cannot be redressed by correcting this access policy. As long as the Council as an organization maintains policies that exclude from participation and demean people in the plaintiffs' position, no amount of evenhanded access to the

leased facilities will redress the plaintiffs' injury: emotional and recreational harm arising out of the Council's control and administration of public land that the plaintiffs wish to use. It is this injury, and not the alleged Boy Scouts' policy of preferential access to the facilities it operates, that supports plaintiffs' standing to maintain their claims under the federal and state religion clauses.[8]

## IV. Explanation of Certification

### A. The Need to Avoid Federal Constitutional Questions

"[F]ederal courts should not decide federal constitutional issues when alternative grounds yielding the same relief are available." *See Kuba v. 1-A Agric. Assoc.*, 387 F.3d 850, 856 (9th Cir. 2004). If the California Constitution provides an independent basis for relief, then there is "no need for decision of the federal issue." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 295 (1982). Yet any interpretation by this court of the State's constitutional clauses, unlike an interpretation by the California Supreme Court, cannot be authoritative. *See Bartoni-Corsi Produce, Inc. v. Wells Fargo Bank, N.A.* (*In re Bartoni-Corsi Produce, Inc.*), 130 F.3d 857, 861 (9th Cir. 1997).

### B. The Need for Certification

We certify three issues to the California Supreme Court because they require interpretation of the state constitution's religion clauses beyond that found in state or federal cases.

---

[8]The dissent asserts that "[t]he Boy Scouts are entitled to gather together freely and reinforce the views they share." The complaint, however, does not challenge the right of the Boy Scouts to associate and share views; it challenges only their entitlement to manage a portion of the City's parks. Our discussion here relates only to whether the plaintiffs can bring this challenge, not to whether their claim ultimately will be found meritorious.

These clauses affect the delicate relationship between the government and religion, and any interpretation of these clauses has significant public policy ramifications.

## 1.   The No Preference Clause

The No Preference Clause states in part that "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed." Cal. Const. art. 1 § 4. The California Supreme Court "has never had occasion to definitively construe" this clause. *E. Bay Asian Local Dev. Corp. v. California*, 24 Cal. 4th 693, 719 (2000). Having not yet been faced with a case that requires it "to declare the scope and proper interpretation" of the clause, it has found no necessity to set the boundaries of the clause. *See Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 562 (2004). We therefore cannot accurately estimate from existing California Supreme Court cases how that Court would apply the No Preference Clause to the case before us. It is true that, in a case involving exemptions from a landmark preservation law for religious institutions, the California Supreme Court held that, because the challenged action passed the federal Establishment Clause test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), it also complied with California's No Preference Clause. *E. Bay Asian Local Dev. Corp.*, 24 Cal. 4th at 719; *see also Paulson v. Abdelnour*, 145 Cal. App. 4th 400, 434 (2006). It is not at all clear, however, whether the Boy Scouts' management of the park facilities complies with the *Lemon* test, and we follow the rule of not deciding federal constitutional questions when state law may be determinative. We know of no authority compelling the California courts to address the *Lemon* test in every challenge brought under the No Preference Clause. Any independent determination of a No Preference Clause issue by the California Supreme Court would be conclusive on this court and this litigation.

Although state intermediate appellate courts have construed the No Preference Clause, the unique facts of this case would

require us to go beyond these decisions. *See, e.g., Woodland Hills Homeowners Org. v. Los Angeles Cmty. Coll. Dist.*, 218 Cal. App. 3d 79, 93-95 (1990); *Okrand v. City of Los Angeles*, 207 Cal. App. 3d 566, 571-72 (1989); *Bennett v. Livermore Unified Sch. Dist.*, 193 Cal. App. 3d 1012, 1016, 1024 (1987); *Feminist Women's Health Ctr., Inc. v. Philibosian*, 157 Cal. App. 3d 1076, 1092 (1984). For example, the plaintiff families challenge the process by which the leases were obtained, but no California court has identified the perspective from which we should scrutinize these processes to determine whether there has been a forbidden preference. The United States Supreme Court adopts the perspective of a reasonable observer when determining Establishment Clause questions, *see County of Allegheny v. ACLU, Greater Pittsburgh Chapter,* 492 U.S. 573, 635 (1989) (O'Connor, J., concurring in part and concurring in the judgment), but at least one Justice of the California Supreme Court has urged that courts interpreting the No Preference Clause "view the issue from the perspective of the minority." *Sands v. Morongo Unified Sch. Dist.*, 53 Cal. 3d 863, 915-16 (Cal. 1991) (Arabian, J., concurring). Thus, we seek certification so that the California Supreme Court, rather than this federal court, can chart the proper course through these unresolved areas.

### 2.  The No Aid Clause

The absence of controlling precedent in regard to the No Aid Clause presents us with an even greater problem, in part because that clause is without a parallel in the United States Constitution. The No Aid Clause prohibits the City from "mak[ing] an appropriation, or pay[ing] from any public fund whatever, or grant[ing] anything to or in aid of any religious sect, church, creed, or sectarian purpose . . . ." Cal. Const. art. XVI § 5. To assess whether the leases violate the No Aid Clause, we must determine whether the leases are aid and, if so, whether the City supports a creed or sectarian purpose by granting the aid to the Boy Scouts. The California Supreme Court has not been called upon to define "aid" in a manner

that applies to the circumstances of this case. Nor has it been required to establish what is a "creed" or "sectarian purpose" to which aid cannot be given.

In its most recent decision construing the No Aid Clause, *California Statewide Communities Development Auth. v. All Persons Interested in Validity of a Purchase Agreement*, 152 P.3d 1070 (Cal. 2007), the California Supreme Court held that the clause did not invalidate a public bond program that facilitated the raising of private money to benefit sectarian institutions. *Id.* at 1081. It had long been established that such aid could be given to religiously affiliated colleges so long as the funds were not used for religious purposes. The question for decision in *Statewide Communities* was whether the same rule applied to institutions that were "pervasively sectarian." *Id.* at 1072. No definition of "pervasively sectarian" was required, because the parties assumed for purposes of the case that the institutions in question were pervasively sectarian. *Id.* For the same reason, it was unnecessary to define precisely a "creed" or "sectarian purpose." The bond arrangement was held not to violate the No Aid Clause so long as the institutions did not use the bond proceeds for sectarian purposes and met certain other requirements, including the offering of a sufficiently broad curriculum of secular subjects. *Id.* at 1077, 1081. The *Statewide Communities* decision does not assist us, however, in determining whether the City's leases to the Boy Scouts violate the No Aid Clause, because the California Supreme Court emphasized that no public funds or real estate passed to the sectarian institutions. *Id.* at 1076. *Statewide Communities* therefore does not affect the need for certification in this case.

The facts of this case also require us to go beyond the framework set forth in our own decision of *Paulson v. City of San Diego*, 294 F.3d 1124 (9th Cir. 2002) (en banc), for interpreting the No Aid Clause. *Paulson* concerned a No Aid Clause challenge to a municipal government's sale of public land containing a cross to a sectarian organization. *Paulson* concluded that the No Aid Clause "prohibits the government

from (1) granting a benefit in any form (2) to any sectarian purpose (3) regardless of the government's secular purpose (4) unless the benefit is properly characterized as indirect, remote, or incidental." *Id.* at 1131. Whether the City granted a benefit to the Scout defendants for the advancement of a creed or sectarian purpose is a very different and more challenging question than that presented in *Paulson*. Resolution of this issue would require expanding our interpretation of California cases. An expansion or contraction of the definitions of "aid," "creed," or "sectarian purpose" could have a substantial impact upon Californians' liberties and the administration of their public lands. We are reluctant to embark on a refinement of the meaning of those terms without the authoritative assistance of the California Supreme Court. We thus ask that Court to exercise its discretion and decide whether the leases are aid and whether this aid benefits a creed or sectarian purpose.

## V.  Administrative Information

The names and addresses of counsel for Lori, Lynn, and Mitchell Barnes-Wallace and Michael, Valerie, and Maxwell Breen are:

> David Blair-Loy
> Elvira Cacciavillani
> ACLU Foundation of San Diego & Imperial Counties
> P.O. Box 87131
> San Diego, CA 92138-7131
>
> Mark W. Danis
> Morrison & Foerster, LLP
> 12531 High Bluff Drive Suite 100
> San Diego, CA 92130-2040

M. E. Stephens
Stock Stephens, LLP
110 West C Street Suite 1810
San Diego, CA 92101

The names and addresses of counsel for Boy Scouts of America and the Desert Pacific Council, Boy Scouts of America are:

George A. Davidson
Carla A. Kerr
Hughes, Hubbard & Reed
1 Battery Park Plaza
New York, NY 10004

Charles Avrith
Alicia Mew
Hughes, Hubbard & Reed
350 S. Grand Ave. 36th Floor
Los Angeles, CA 90071-3442

Scott H. Christensen
Hughes, Hubbard & Reed
1775 I Street, N.W.
Washington, DC 20006-5040

As required by California Rules of Court 8.548(c) and (d), the Clerk of this Court shall submit copies of all relevant briefs and an original and ten (10) copies of this Order to the Supreme Court of California with a certificate of service on the parties.

## VI.    Stay and Withdrawal from Submission

All further proceedings in this case in this court are stayed, except for petitions for rehearing or rehearing en banc, or sua sponte calls for en banc rehearing, relating to this certification order. The Clerk will not transmit this order to the California

Supreme Court for its consideration until time has run for any such petitions or calls and, if any such petitions or calls are made, until proceedings relating to such petitions or calls have been completed.

This case is withdrawn from submission until further order of this court. The parties shall notify the Clerk of this Court within one week after the California Supreme Court accepts or rejects certification, and again within one week if that Court renders an opinion.

---

BERZON, Circuit Judge, concurring:

When Rosa Parks refused to ride in the back of a Montgomery bus one afternoon in 1955, she did so because she disagreed with a city government that let her make use of its services, but relegated her to second class status. When she and other African-American citizens decided to boycott the city's bus lines, they did so because they would rather avoid these public facilities than be forced to interact with an institution that denigrated them and excluded them from full citizenship — while at the same time "tolerating" their presence in the back of the bus.

Yet, when some of those citizens then sued the city of Montgomery, there was no argument then made that they lacked standing because the only injuries they asserted were merely the "psychological consequence [of] . . . observation of conduct with which one disagrees." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 485 (1982); *compare Browder v. Gayle*, 142 F. Supp. 707, 711 (M.D. Ala. 1956) ("[P]laintiffs, along with most other Negro citizens of the City of Montgomery, have . . . refrained from making use of the transportation facilities provided by Montgomery City Lines, Inc."), *aff'd*, 352 U.S. 903 (1956).

Any comparison to the Jim Crow South may seem greatly overblown, and in most respects it certainly is. The Boy Scouts do not express disdain for homosexuals and atheists anywhere near as graphically or concretely as the Jim Crow South did blacks, and the Boy Scouts are only one group, not an entire society and governmental structure. And, on the merits, the issues here are entirely different from, and quite obviously nowhere near of the same magnitude of impact or historic significance as, those in the seminal desegregation cases.

But at this point — although the dissent carefully avoids so recognizing in excoriating my comparison — we are concerned only with standing: whether the Barnes-Wallace and Breen families have suffered an injury allowing them to be heard in court. And in its nature, though certainly not its degree, the *injury* that the Barnes-Wallace and Breen families claim is much the same as that suffered by the plaintiffs in the bus desegregation cases. Just as African-Americans could ride on Montgomery's buses, but not in the front, the Scouts permit Plaintiffs to make use of Camp Balboa and the Mission Bay Park Youth Aquatic Center, but do not allow them to be members of their organization and participate in the activities conducted at the camps for members. In either case, use of a valuable public facility is made contingent on acceptance of imposed second class status within a controlling organization's social hierarchy.

Judge Kleinfeld disagrees, viewing the injury Plaintiffs assert here as simply *their* "revulsion for [the] Boy Scouts" and "feelings of disagreement" with its beliefs. This assertion betrays a rather skewed view of which direction the revulsion actually flows in this case, and to what effect.[1] One only need

---

[1]The dissent criticizes plaintiffs for bringing this case "under the guise that their own feelings and disagreements make them feel excluded." The sociological term for the tendency to attribute fault for injuries experienced by members of a subordinated group to the group itself is "blaming

look at the Boy Scout Oath and Law — the dissent's skepticism concerning the derogatory messages conveyed by parts of those liturgies notwithstanding — to see that requiring plaintiffs to deal with the Scouts in order to use Camp Balboa and the Mission Bay Park Youth Aquatic Center results in an injury which, in fact, is very real.

The offense Plaintiffs suffer comes from having to interact with a group that excludes *them*, on the basis of personal characteristics which that group denigrates and to which it ascribes moral opprobrium. The Boy Scouts Oath and Law contain many uplifting sentiments that contain no implicit criticisms and are in no way exclusionary. But the Boy Scouts also require their members to promise to be "morally straight" — and so exclude gays and lesbians, like the Barnes-Wallaces, from participation in the organization because the Scouts believe that homosexuality is incompatible with *moral* straightness and cleanliness. *See Boy Scouts of Am. v. Dale,* 530 U.S. 640, 652 (2000) (quoting Scouts' position that "homosexual conduct is inconsistent with the requirement in the Scout Oath that a Scout be morally straight and in the Scout Law that a Scout be clean in word and deed"). The Scouts also exclude atheists and agnostics, like the Breens, on the ground that "no member can develop into the best kind of citizen without recognizing an obligation to God." *Randall v. Orange County Council, Boy Scouts of Am.*, 17 Cal. 4th 736, 742 (1998) (citing the Scouts' expectation that their leaders will convey this position to their members).

So let us be clear about the source of the "disagreement" here: The Scouts exclude people like the Breens and Barnes-

---

the victim." *See*, *e.g.*, William Ryan, *Blaming the Victim* (Vintage, 1976); *cf. Hernandez v. Ashcroft*, 345 F.3d 824, 836 (9th Cir. 2003) (noting that "lay understandings of [the causes of] domestic violence" are "frequently comprised of myths, misconceptions, and victim blaming attitudes" (internal quotation marks omitted)).

Wallaces, because the Scouts believe them to possess characteristics that make them morally unclean and incapable of being the "best kind of citizen." In other words, the reason the Scouts exclude the Breens and Barnes-Wallaces is not simply that they do not have the same beliefs or practice the same life styles; the reason is that, to the Scouts, the Breens and Barnes-Wallaces hold beliefs and practice life styles that are reprehensible and subject to deeply held, adverse moral judgments. To *not* take serious offense from such characterizations would require a better sense of humor than most of us possess.[2]

More importantly, there is not merely offense here but injury too. To use Camp Balboa and the Mission Bay Park Youth Aquatic Center, the Plaintiffs must not just *observe* the presence of the Boy Scouts, but also interact with, seek permission from, and, quite significantly, pay fees to, this same organization that believes them inferior in both morals and citizenship. Plaintiffs allege that in order to avoid such a situation, they and their children forgo use of the site, thereby giving up a basic interest that citizens possess in public land — the right to simply enter and enjoy its recreational environment. *See, e.g.*, *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1396 (9th Cir. 1992). Our case law is quite clear, of course, that avoidance of public land that one would otherwise visit and use is an injury that gives rise to standing. *Buono v. Norton*, 371 F.3d 543, 546-47 (9th Cir. 2004).

The absence of giant crosses or massive Boy Scout emblems in this case, of which the dissent makes much, is simply a 51-foot tall red herring. To return to my historical analogy, suppose that, during the civil rights movement era, a municipality permitted a local White Citizens Council,

---

[2]"I don't care to belong to any club that will have me as a member." Arthur Sheekman, *The Groucho Letters* (1967) (quoting Groucho Marx); *see also Allen v. National Video, Inc.*, 610 F. Supp. 612, 617 (S.D.N.Y. 1985) (paraphrasing same).

which opposed desegregation and extension of voting rights to blacks, to operate on public land a recreation center, which African-American families could, for a fee paid to the Council, get permission from the Council to use. Would those families lack an injury-in-fact if they avoided using those facilities in order to avoid this *direct interaction* with an organization whose policy, otherwise, is to exclude and demean them? And would the answer differ depending on whether or not the Council erected a billboard on the property endorsing "Segregation Forever"?[3]

The obviousness of the answer to this question is reflected in the long series of First Amendment cases illustrating that, when plaintiffs are required to choose between either paying a fee to an organization with which they disagree or forgoing an interest to which they are entitled, the existence of an injury-in-fact is simply taken as a given. *See, e.g., Keller v. State Bar of Cal.*, 496 U.S. 1 (1990) (plaintiff required as a condition of law practice to pay dues to state bar with whose political activities it disagreed); *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209 (1977) (plaintiff required as a condition of employment to pay dues to union with which it disagreed). As here, the decisive element in those cases was the direct injury to the plaintiff's interests generated in part by the requirement of interaction with a group with which one did

---

[3]As this example suggests, Judge Kleinfeld's complaint that it is inappropriate to compare Boy Scout emblems to symbols of white supremacy misses my point entirely: The absence or presence on public land of *symbols* of exclusion, whether racial, religious or otherwise, is *not* the focus of the standing issue in this case. Plaintiffs' injury here comes from the requirement of having to directly interact with, and pay fees to the Boy Scouts — the actual *excluders,* themselves — in order to use this land. And the dissent's representation to the contrary notwithstanding, Plaintiffs' avoidance of this land is not a reaction to what they "imagine the Boy Scouts feel about them." Instead, it is a response to the Scouts' actual policy of excluding gays and atheists, which is a matter of legal record, not bare speculation. *See, e.g., Dale,* 530 U.S. at 652; *Randall,* 17 Cal. 4th at 742 (1998).

not want to associate, not the mere fact of a disagreement with the defendant organization. True, these cases and others like them ultimately concluded that there are circumstances in which mandatory association is permitted and devised limited remedies for those circumstances in which it is not. *See*, *e.g.*, *Abood*, 431 U.S. at 237-40. But for present purposes, the salient point is that the legal system recognized the *complaint* of the plaintiffs in those cases — that they should not have to associate with and pay fees to an organization with which they disagreed to have access to commonly available benefits — as one which the plaintiffs were entitled to raise in court, and to which they were entitled a judicial answer.

For all these reasons, the dissent's suggestion that our granting standing in this case means that anyone who disagrees with the beliefs of any other group to which the City of San Diego leases property could bring similar litigation is entirely overblown. To succeed on the standing theory the majority adopts, such would-be plaintiffs would have to show (1) that on the property leased to that group by the city there is some site or facility which the individual plaintiffs could have and *would have* visited and used, were it not for (2) that group having an exclusionary policy that *directly* and *personally* affects the plaintiffs, and (3) that use of the property would require interaction with the group, such as paying fees for use of the facility, and perception of its symbols. *Cf. Allen v. Wright*, 468 U.S. 737, 756-57 & n.22 (1984). Moreover, even if standing were so established, to prevail in their suit the plaintiffs would still have to prove that the defendant group's adherence to this policy means that the city's leasing it the property violates the state or federal constitution.

I am entirely unconvinced that allowing such cases to be litigated in court will, as the dissent suggests, "undermine free speech and freedom of association." Instead, providing the plaintiffs with their day in court will ensure that when government turns the public's property over to private groups, it does so in accordance with relevant constitutional require-

ments. We certify the merits issues raised in this case to the California Supreme Court because the question of what the California Constitution requires in this case is one best answered by the state's Supreme Court. What I do not doubt, however, is that Plaintiffs here have demonstrated sufficient standing to raise it.

Accordingly, I concur in the majority order.

KLEINFELD, Circuit Judge:

I respectfully dissent.

We issued a previous order in this case.[1] I dissented, on the ground that the plaintiffs lacked standing.[2] The Boy Scouts petitioned for rehearing, and the majority now issues an order with a quite different standing analysis. Without standing, there is no federal jurisdiction, and no authority to certify.

Surprisingly, the majority now bases standing on a theory the majority expressly rejected the last time around. The new theory is that the plaintiffs would like to use the parks but "avoid doing so because they are offended by the Boy Scouts' exclusion, and publicly expressed disapproval, of lesbians, atheists and agnostics."[3] The theory is that the plaintiffs suffer "emotional harm and the loss of recreational enjoyment"[4] because they "do not want to view signs posted by the Boy Scouts or interact with the Boy Scouts' representatives in order to gain access to the facilities."[5]

---

[1]*Barnes-Wallace v. City of San Diego*, 471 F.3d 1038 (9th Cir. 2006).

[2]*Id.* at 1049 (Kleinfeld, J., dissenting).

[3]Order certifying question to the Supreme Court of California at 6597, *Barnes-Wallace v. City of San Diego*, No. 04-55732.

[4]*Id.* at 6599.

[5]*Id.* at 6598.

Perhaps I need say no more than that the majority expressly rejected this very theory the last time around, and rightly so. Here is what the majority said last time about the theory it adopts this time:

> We reject the families' other theories of standing. The Breens' and the Barnes-Wallaces' purposeful avoidance of the parklands leased by the Boy Scouts as a protest against the Scouts' exclusionary policies is not a sufficient injury. We have held that people can suffer a direct injury from the need to avoid large religious displays, such as giant crosses or life-size biblical scenes. *See, e.g.*, *Buono*, 371 F.3d at 549 (five to eight-foot-tall cross); *SCSC*, 93 F.3d at 619 (fifty-one-foot-tall cross); *Ellis*, 990 F.2d at 1520 (thirty-six-foot and forty-three-foot-tall crosses); *Kreisner v. City of San Diego*, 1 F.3d 775, 777 (9th Cir.1993) (ten by fourteen-foot displays containing life-size statuary of biblical scenes). But there are no displays in either Camp Balboa or the Aquatic Center that would be so overwhelmingly offensive that families who do not share the Scouts' religious views must avoid them. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (requiring the plaintiffs to show a personal injury suffered "as a consequence of the alleged constitutional error") (emphasis omitted).[6]

That was correct and that should be the end of the case. To assist the reader, I will speak a little more extensively than the majority did last time on why the psychological theory is mistaken, and the cases distinguished last time were correctly distinguished.

---

[6]*Barnes-Wallace*, 471 F.3d at 1045-46.

The overarching authority for this standing issue is the Supreme Court decision in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*[7] The Court granted certiorari in that case to reject "the unusually broad and novel view of standing" that the lower court had applied in Establishment Clause cases.[8] In *Valley Forge*, advocacy groups challenged a government decision to give excess government real estate for free to the Assemblies of God to operate a Christian college. The Court expressly rejected the psychological injury theory argued in that case and ours. The Court held that "psychological" injury caused by "observation" of "conduct with which one disagrees" is "not an injury sufficient to confer standing under Art. III,"[9]

> They fail to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms.[10]

It is not enough, under controlling authority, that plaintiffs have an interest in the conduct they challenge. For them to have standing, they need a "legally protected interest."[11] Under *Valley Forge*, "psychological consequence,"[12] even when strongly felt, is not what *Lujan v. Defenders of Wildlife* calls a "legally protected interest"[13] and "standing is not mea-

---

[7]*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982).

[8]*Id.* at 470.

[9]*Id.* at 485.

[10]*Id.*

[11]*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[12]*Valley Forge*, 454 U.S. at 485.

[13]*Lujan*, 504 U.S. at 560.

sured by the intensity of the litigant's interest or the fervor of his advocacy."[14]

The majority now distinguishes *Valley Forge* on the theory that the plaintiffs in that case did not want to use the land and the plaintiffs in this case do.[15] The *ratio decidendi* of *Valley Forge* does not support this distinction. *Valley Forge* holds that "psychological" injury caused by "observation" of "conduct with which one disagrees" is not a concrete injury to a legally protected interest sufficient to confer standing, and that is what the plaintiffs allege. Thus being there and seeing the offending conduct does not confer standing.

In *Valley Forge*, the Court saw no significance to the fact that one of the advocacy groups objecting to this giveaway of federal land near Philadelphia had members who lived in Pennsylvania.[16] But suppose that the distinction would make a difference, as when environmental advocacy groups have standing or not depending on whether they have members who use the land affected by the proposed federal action.[17] There still needs to be a concrete injury to a legally protected interest, and in our case there is nothing but avoidance of a place because of people there who hold different views.

The authorities the majority relies on today (having distinguished them last time) are our gigantic cross cases, primarily *Buono v. Norton*[18] and *Ellis v. City of La Mesa.*[19] *Buono* applied *Separation of Church & State Committee v. City of Eugene*,[20] which had held that a 51-foot-tall neon-illuminated

---

[14]*Valley Forge*, 454 U.S. at 486.

[15]Order certifying question to the Supreme Court of California at 6599-6600, *Barnes-Wallace v. City of San Diego*, No. 04-55732.

[16]*Valley Forge*, 454 U.S. at 487 n.23.

[17]*See Lujan*, 504 U.S. at 560.

[18]*Buono v. Norton*, 371 F.3d 543 (9th Cir. 2004).

[19]*Ellis v. City of La Mesa*, 990 F.2d 1518 (9th Cir. 1993).

[20]*Separation of Church & State Committee v. City of Eugene*, 93 F.3d 617 (9th Cir. 1996).

cross on the crest of a hill in a city park violated the Establishment Clause.[21] In *Buono* the cross in Mojave National Preserve was five to eight feet tall on a prominent rock outcropping rising 15 to 20 feet above grade. It appeared "likely that the Sunrise Rock cross will project a message of government endorsement to a reasonable observer" of a particular religious belief.[22] The plaintiff had standing because he regularly visited the preserve and took an inconvenient road to avoid viewing the prominent cross on government property.[23]

*Buono* holds that the "inhibition" from using public land "*as a consequence* of the alleged constitutional error" created by the cross goes beyond a mere psychological injury. This holding has boundaries, among them the facts of *Buono* and the holding in *Valley Forge*. *Buono* distinguishes "the psychological consequence presumably produced by observation of conduct with which it disagrees," and a psychological consequence is all plaintiffs establish in this case.[24]

In *Ellis*, there were three crosses, one 36 feet high on top of a mountain, one 43 feet high in a city park, and a picture of the mountaintop cross on the city insignia.[25] The plaintiffs avoided the locations, missed the spectacular view from the mountaintop, and one claimed that he declined to invite business clients to the city because the cross offended them. We held that the plaintiffs who would have visited the public areas but for the crosses had standing because their access to public property was interfered with by the crosses. The majority applies the same theory here. Applying these cases, though, to a case where there is no gigantic cross, is an unjustified extension of their holdings.

---

[21]*Id.* at 618.

[22]*Buono*, 371 F.3d at 549.

[23]*Id.* at 547.

[24]*Buono*, 371 F.3d at 547 (quoting *Valley Forge*, 454 U.S. at 485).

[25]*Ellis*, 990 F.2d at 1520.

The majority was correct the last time, when it distinguished the gigantic cross cases. Previously, it held that "[t]he Breens' and the Barnes-Wallaces' purposeful avoidance of the parklands leased by the Boy Scouts as a protest against the Scouts' exclusionary policies is not a sufficient injury . . . [because] there are no displays in either Camp Balboa or the Aquatic Center that would be so overwhelmingly offensive that families who do not share the Scouts' religious views must avoid them." I agree.

In our gigantic cross cases, the government maintained what amounted to a shrine for a particular religion on public land. Since time immemorial, shrines have been erected on hills and mountaintops.[26] A huge cross on a hill or mountaintop would appear to a reasonable objective observer to be a shrine. People not sharing the religious views represented by the cross become visitors to another religion's shrine. On public lands, we are all owners, none of us are mere guests. Even if the Boy Scout emblem were 51 feet tall, illuminated by neon, and at the crest of a hill (none of which is true), no reasonable observer would think that the Boy Scout emblem created a shrine to a major religion or sexual preference. A gigantic cross on a mountaintop carries religious significance that a herd of 11 year old boys camping out and swimming does not.

Unlike a cross, neither a Boy Scout, nor the Boy Scout emblem (an eagle with a shield on a fleur-de-lis), nor a sign saying "Boy Scouts," is the central symbol of any religion or sexual preference. One would have no idea that the Boy Scouts even had any views about religion or sex without doing research. And even if one did, one would, as the petition for rehearing demonstrates, learn that sex and religion are but an incidental part of scouting. If one reads the Boy Scout Handbook to find out whether the Boy Scouts are primarily oriented around sexual and religious teachings, one will be

---

[26]*See, e.g.*, 1 Samuel 9:9-13; 1 Kings 3:2.

disappointed to find that there are more pages about knot tying than sex and religion combined, and that most of what Boy Scouts learn about and do involves camping, boating, hiking, swimming, and charitable activities.

Here is the Boy Scout oath that the Barnes-Wallaces say makes them "feel degraded."

> **Scout Oath or Promise**
> On my honor I will do my best
> To do my duty to God and my country
> and to obey the Scout Law;
> To help other people at all times;
> To keep myself physically strong,
> mentally awake, and morally straight.

Those who disagree with religion of any sort, patriotism, altruism, physical fitness, mental alertness, or honesty as virtues would not want to take this oath, but no one has to take the oath or know what it says to use the park. Here is the Boy Scout Law that generations of Scouts have been required to memorize, and that the Breens swear makes them feel "disturbed" and "offended,"

> **Scout Law**
> A Scout is trustworthy, loyal,
> helpful, friendly, courteous, kind,
> obedient, cheerful, thrifty, brave,
> clean, and reverent.

One who rejects any of these as virtues, not just reverence, would not want to follow the Boy Scout Law, but no one has to honor or even know of the oath in order to use the park. Many generations of Boy Scouts have committed the whole oath to memory, as they must to get their Tenderfoot badge. Without memorizing the Scout Law or looking it up, one would not even know that it included a non-sectarian reference to religion. By contrast, a gigantic cross on a mountain-

top requires no research to let the visitor know that he is visiting a Christian shrine.

There is a distinction between a prominent display of an unambiguous religious symbol on public land and groups with myriad viewpoints working with government to facilitate public use of lands. San Diego, like many municipalities, leases property to many non-profit groups: San Diego Calvary Korean Church, Point Loma Community Presbyterian Church, the Jewish Community Center, the Vietnamese Federation, the Black Police Officers Association, and ElderHelp. No doubt people can be found in San Diego who do not like Koreans, Presbyterians, Jews, Vietnamese, Blacks, and old people, and who disagree with the beliefs people in these groups share. Their feelings of disagreement or dislike should not be treated as the "concrete injury" that is "an invasion of a legally protected interest" required for standing.[27]

---

[27]Judge Berzon almost concedes that her "comparison to the Jim Crow South may seem greatly overblown." Indeed it does. Comparing the feelings of lesbians or atheists in San Francisco who object to the Boy Scouts managing a municipal facility, even though they have full, open, and totally nondiscriminatory access, to the treatment of black people in the Jim Crow South is worse than overblown. It is obscene.

It is beyond me how anyone old enough to recall when they separated us in Delaware on the train from New York to Washington, D.C., can use the Jim Crow laws as an analogy to the Boy Scouts managing facilities in Balboa Park. Black people were not allowed access, generally south of the Delaware-Pennsylvania state line, to diners, restaurants, water fountains, the front of the bus, and the front of railroad cars until the civil rights movement awakened America to the injustice of racial exclusion in the 1950's and 1960's. Gays, lesbians and atheists have access identical to everyone elses' in the public spaces at issue in this case. They just don't want to use it because of their offended feelings.

Judge Berzon concedes in footnote 3 that "[t]he absence or presence on public land of *symbols* of exclusion, whether racial, religious or otherwise, is *not* the focus of the standing issue in this case," yet the only standing case she cites in her concurrence, *Buono v. Norton*, 371 F.3d 543 (9th Cir. 2004), turns precisely on the presence of a cross on public land. Judge Berzon's other case citations, *Fund for Animals, Inc. v. Lujan*, 962 F.2d

There is a distinction important to our liberties between having a legally protected interest and having an interest in not being offended. Some people may feel "degraded" or "offended" because of the Boy Scouts' positions on reverence and sexuality but so long as their access is unimpaired, the feeling is no stronger a basis for standing than the feelings others may have about atheists or lesbians managing the facility. By treating the Barnes-Wallaces and Breens revulsion for Boy Scouts and consequent avoidance of a place the Boy Scouts manage as conferring standing, we extend standing to a claim that precedent does not support. And we assist in a campaign to destroy by litigation an association of people because of their viewpoints. A feeling of revulsion for others who have different beliefs, so strong that one feels degraded or excluded if they are present, does not confer standing.

Granting standing to the Barnes-Wallaces and the Breens undermines freedom of speech and freedom of association. The Boy Scouts are entitled to gather together freely and reinforce the views they share. The Barnes-Wallaces and the Breens can use the facilities that the Boy Scouts manage without agreeing to the Boy Scouts' views, and without the quiet and respectful politeness we all exercise in the presence of another religion's shrines.

---

1391, 1396 (9th Cir. 1992), *Keller v. State Bar of California*, 496 U.S. 1 (1990), *Abood v. Detroit Board of Education*, 431 U.S. 209, 240 (1977), and *Allen v. Wright*, 468 U.S. 737, 756-57 and n. 22 (1984), are also ill-fitting, as any intrepid scholar will discover.

It is crucial to the majority's argument to call the Boy Scouts "the excluders," but at Balboa Park, they do not exclude. The exclusion, to confer standing, must be from a facility to which one desires access. The Presbyterian Church, would, I should think, exclude me from employment as a minister, because I am Jewish, but if they managed a recreational facility open to all without discrimination as the Boy Scouts do, their ministry exclusion would not give me standing to challenge their park management contract. Exclusion from something else entirely, employment as a minister, does not confer standing to challenge any relationship the government has with the organization.

One virtue not in the Boy Scout law, doubtless because in a free society it is taken for granted, is tolerance. The Boy Scouts must and do display tolerance for gay, lesbian, atheist, and agnostic users of the facilities that they manage for the city. A free country requires that groups with differing views, such as the plaintiffs and the Boy Scouts, nevertheless have to display tolerance for each other. Granting standing to one because the presence of the other revolts them, under the guise that their own feelings and disagreements make them feel excluded, threatens all our liberties.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2008 Thomson Reuters/West.