# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MITCHELL BARNES-WALLACE;
MAXWELL BREEN,
                   *Plaintiffs-Appellees,*

              v.

CITY OF SAN DIEGO,
                        *Defendant,*

           and

BOY SCOUTS OF AMERICA - DESERT
PACIFIC COUNCIL,
             *Defendant-Appellant.*

No. 04-55732

D.C. No.
CV-00-01726-
NAJ/AJB

MITCHELL BARNES-WALLACE;
MAXWELL BREEN; LORI BARNES-
WALLACE, Guardian Ad Litem;
LYNN BARNES-WALLACE, Guardian
Ad Litem; MICHAEL BREEN,
Guardian Ad Litem; VALERIE
BREEN, Guardian Ad Litem,
                *Plaintiffs-Appellants,*

              v.

CITY OF SAN DIEGO; BOY SCOUTS OF
AMERICA - DESERT PACIFIC
COUNCIL,
             *Defendants-Appellees.*

No. 04-56167

D.C. No.
CV-00-01726-
NAJ/AJB

ORDER

Filed December 31, 2008

Before: William C. Canby, Jr., Andrew J. Kleinfeld, and
Marsha S. Berzon, Circuit Judges.

16859

Order;
Dissent by Judge O'Scannlain

---

# ORDER

Judge Berzon has voted to deny the petition for en banc rehearing of the Certification Order filed June 11, 2008, and Judge Canby has so recommended. Judge Kleinfeld has voted to grant en banc rehearing.

The petition for en banc rehearing has been circulated to the full court. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed R. App. P. 35. Judges Gould, Tallman, Clifton and N.R. Smith were recused.

The petition for rehearing en banc is denied. The Clerk of this Court is instructed to transmit the Order Certifying Questions, filed June 11, 2008, to the Supreme Court of California as directed under Section V of that Order. The earlier order of December 18, 2006, certifying questions to the California Supreme Court was withdrawn by this court on June 11, 2008.

This case shall continue to be withdrawn from submission until further order of this Court.

---

O'SCANNLAIN, Circuit Judge, dissenting from the denial of rehearing en banc, joined by KLEINFELD, BYBEE, CALLAHAN, BEA, and IKUTA, Circuit Judges:

Today, our court promulgates an astonishing new rule of law for the nine Western States. Henceforth, a plaintiff who claims to feel offended by the mere thought of associating

with people who hold different views has suffered a legally cognizable injury-in-fact. No other circuit has embraced this remarkable innovation, which contradicts nearly three decades of the Supreme Court's standing jurisprudence. In practical effect, the three-judge panel majority's unprecedented theory creates a new legal landscape in which almost anyone who is almost offended by almost anything has standing to air his or her displeasure in court. I must respectfully, but vigorously, dissent from our failure to rehear this case en banc.

I

For nominal rent, the City of San Diego leases portions of two public parks to the Desert Pacific Council, which is a "nonprofit corporation chartered by the Boy Scouts of America." *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 779 (9th Cir. 2008). The Boy Scouts operate Camp Balboa in Balboa Park, which "includes campgrounds, a swimming pool, an amphitheater, a program lodge, a picnic area, a ham radio room, restrooms and showers, and a camp ranger office." *Id.* at 781. The Boy Scouts also operate a Youth Aquatic Center on Fiesta Island, which "offers the use of kayaks, canoes, sail and row boats, and classroom space to other youth groups at inexpensive rates." *Id.* Importantly, "[t]here are no religious symbols either at Camp Balboa or at the Youth Aquatic Center." *Id.* at 782.

For limited times, the Boy Scouts use the leased areas for their own events, but otherwise keep the areas open to the general public. Although the Boy Scouts' membership policies exclude homosexuals and agnostics, the Boy Scouts do not discriminate on the basis of sexual orientation or religion in administering the leased parklands.[1] A homosexual or an agnostic may use the lands leased to the Boy Scouts on the

---

[1]Indeed, as the plaintiffs' own complaint concedes, the leases themselves, in conjunction with the Municipal Code of San Diego, prohibit discrimination on the basis of religion or sexual orientation.

same terms as everybody else. Indeed, "[t]he San Diego Boy Scouts have not turned away any non-Scout group while Scouting is in session, either at Camp Balboa or at the Aquatic Center." *Id.* at 782.

Nevertheless, a lesbian couple with a son and an agnostic couple with a daughter challenged the leases under the religion clauses of the United States and California Constitutions. The families did not have any of the traditional bases of standing: they did not compete for the leases, try to participate in any Boy Scout activities on the leased land, or even use or try to use the land for their own purposes (although they did use the portions of the parks that the Boy Scouts did not use). Rather, the families based standing on the claim that although they wanted to use the public land and *could* use it without interference from the Boy Scouts, they nevertheless declined to use it, because they *would be* offended by the Boy Scouts' views on sexuality and religion if they did.

The majority initially rejected the families' psychological injury claim, holding:

> The Breens' and the Barnes-Wallaces' purposeful avoidance of the parklands leased by the Boy Scouts as a protest against the Scouts' exclusionary policies is not a sufficient injury. We have held that people can suffer a direct injury from the need to avoid large religious displays, such as giant crosses or life-size biblical scenes . . . . But there are no displays in either Camp Balboa or the Aquatic Center that would be so overwhelmingly offensive that families who do not share the Scouts' religious views must avoid them. *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485, 102 S. Ct. 752, 70 L.Ed.2d 700 (1982) (requiring the plaintiffs to show a personal injury suffered 'as a consequence of the alleged constitutional error') (emphasis omitted).

*Barnes-Wallace v. City of San Diego*, 471 F.3d 1038, 1045-46 (9th Cir. 2006). The panel allowed the case to proceed on alternate standing grounds.

Then, on rehearing, the majority reversed itself and adopted the theory it had initially rejected. It concluded that "the Breens and Barnes-Wallaces have avoided Camp Balboa and the Aquatic Center because they object to the Boy Scouts' presence on, and control of, the land: They do not want to view signs posted by the Boy Scouts or interact with the Boy Scouts' representatives in order to gain access to the facilities." *Id.* at 784. The Article III injury-in-fact, according to the majority, was the Breens' and the Barnes-Wallaces' "offen-[se]" at "the Boy Scouts' exclusion, and publicly expressed disapproval, of lesbians, atheists and agnostics," their "aversion to the facilities," and their "fe[elings of] unwelcome[ness] there because of the Boy Scouts' policies that discriminated against people like them." *Id.* at 783, 784. Having satisfied itself that it had jurisdiction, the panel then certified the California constitutional law questions to the California Supreme Court.[2]

---

[2]This case is far more than a harmless certification order. It constitutes a precedential decision on the issue of standing. Even worse, if the Barnes-Wallaces and the Breens lose on the merits before the California Supreme Court, the panel majority's standing decision will be entirely insulated from further review. Thus, unless the City of San Diego files a petition for certiorari in the United States Supreme Court now, which, of course, it may do, *see* 28 U.S.C. § 1254, the majority's standing decision may be unreviewable.

Indeed, even before the merits of the Establishment Clause challenge have been resolved, the majority's opinion already has had collateral consequences. One district court in our circuit has already cited the majority's order as binding precedent to reach a conclusion it might not otherwise have reached. *See Trunk v. City of San Diego*, 568 F. Supp. 2d 1199, 1205 (S.D. Cal. 2008) ("If Plaintiffs' claims were based on any theory other than violation of the Establishment Clause, they would likely be out of court for lack of standing . . . . In the Ninth Circuit, however, merely being ideologically offended, and therefore reluctant to visit public land where

Writing for herself in a separate concurrence, Judge Berzon compared the Breens and the Barnes-Wallaces' plight to Rosa Parks' refusal to ride in the back of segregated buses. According to Judge Berzon: "Just as African-Americans could ride on Montgomery's buses, but not in the front, the Scouts permit Plaintiffs to make use of Camp Balboa and the Mission Bay Park Aquatic Center, but do not allow them to be members of their organization and participate in the activities conducted at the camps for members." *Id.* at 791. Judge Kleinfeld dissented.

## II

This case is most notable for what it does *not* involve. There is no economic injury here; the families did not compete with the Boy Scouts for the leases. Nor did the families try to join the Boy Scouts or to participate in Boy Scout activities in the parks. Thus, they cannot claim that they were excluded from anything. Most critically, the families did not even *try* to use, for their own purposes, the portions of the parks that the Boy Scouts control. Thus, they cannot even claim that they suffered any psychological injury as a result of associating with the *Boy Scouts*. Rather, the claim here is that the families are psychologically injured by *the thought of* associating with the Boy Scouts; they contend that they *would be* offended by the Boy Scouts' views *if* they chose to use the parks.

That is an unprecedented theory. It splits standing law at the seams, forcing open the courthouse doors to plaintiffs

a perceived Establishment Clause violation is occurring, suffices to establish 'injury in fact.' . . . *Barnes-Wallace v. City of San Diego*, 530 F.3d 776, 784-85 (9th Cir. 2008) (holding lesbian and agnostic parents had suffered injury in fact because they disagreed with the Boy Scouts' religious and moral position and therefore avoided recreational park facilities used by Boy Scouts). Bound by these precedents, the Court concludes all Plaintiffs have standing to bring this lawsuit.").

without concrete, particularized injuries. Henceforth, a plain-tiff need only assert that he *would* be offended *if* he chose to interact with someone whose beliefs offend him. Does this mean that an animal rights activist may sue the owner of a hot dog stand located on government property for buying beef from ranchers in violation of FDA health requirements, even if the activist has never visited the stand? Should the activist so much as allege that she *wants* to visit the stand but is offended by the stand owner's implicit endorsement of how range cattle are treated in Kansas or by the owner's reluctance to hire PETA activists, the majority, it seems to me, would roll out the red carpet.

An example from Judge Kleinfeld's dissent from the panel's decision sharpens the issue: If a Jewish plaintiff chal-lenges a government lease to the Protestant Church to operate a non-discriminatory recreational facility that the plaintiff has never visited, may the Jewish plaintiff base standing on the grounds that the Protestant Church prevents him from serving as a minister? *Barnes-Wallace*, 530 F.3d at 797 n.27 (Klein-feld, J., dissenting). Again, nothing in the majority's analysis forecloses such claims. After today, the only real hard and fast limit on a plaintiff's standing to sue that I can see will be the viability of the underlying claim on the merits.

In her concurrence, Judge Berzon tries to limit the sweep-ing reach of the majority's standing analysis. She says:

> To succeed on the standing theory the majority adopts, such would-be plaintiffs would have to show (1) that on the property leased to that group by the city there is some site or facility which the individual plaintiffs could have and *would have* visited and used, were it not for (2) that group having an exclu-sionary policy that *directly* and *personally* affects the plaintiffs, and (3) that use of the property would require interaction with the group, such as paying

    fees for use of the facility, and perception of its sym-
    bols.

*Id.* at 793.

Judge Berzon's supposed limits are ephemeral. Putting aside the important fact that these "limits" appear in a one-judge concurrence without precedential value, any plaintiff can insert into his complaint the throwaway line, which is nearly impossible to disprove, that he "would visit" or "would use" a given piece of property. Many groups have exclusionary membership policies. Indeed, the ability to exclude those who do not share the group's goals or commitments is an integral part of what defines a *group*. And the use of the property almost always will "require interaction with the group." Organizations generally don't lease government property only not to use it.

### III

By stretching the definition of an injury-in-fact beyond the breaking point to include injuries-in-theory, the majority's opinion is also inconsistent with longstanding Supreme Court precedent.

In *Valley Forge v. Ams. United for Separation of Church & State*, 454 U.S. 464 (1982), the Supreme Court rejected a standing claim that is materially indistinguishable from the one raised by the Breens and the Barnes-Wallaces. There, the federal government gave surplus property to the Valley Forge Christian College, which was dedicated to "offer[ing] systematic training on the collegiate level to men and women for Christian service as either ministers or laymen." *Id.* at 468 (internal quotation marks omitted). Americans United For Separation of Church and State "learned of the conveyance through a news release" and challenged the property transfer under the Establishment Clause of the First Amendment. *Id.* at 469. The Court held that standing was lacking, concluding

that the plaintiffs "fail[ed] to identify any personal injury suffered by them *as a consequence* of the alleged constitutional error, other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Id.* at 485.

As the first incarnation of the majority's certification order correctly recognized, *Valley Forge* resolves this case. Like the plaintiffs in *Valley Forge*, the Breens and the Barnes Wallaces' claim of "psychological" injury stems from "observation of conduct with which [they] disagree[ ]," *id.,* an injury that is not legally cognizable.

But the majority changed its mind. This time around, it distinguishes *Valley Forge* on the grounds that the Breens and the Barnes-Wallaces "have expressed a desire to make personal use of the facilities" while the *Valley Forge* plaintiffs learned of the property grant through a news release. That is a distinction without a difference. Judge Kleinfeld got it right when he said:

> The *ratio decidendi* of *Valley Forge* does not support this distinction. *Valley Forge* holds that "psychological" injury caused by "observation" of "conduct with which one disagrees" is not a concrete injury to a legally protected interest sufficient to confer standing, and that is what the plaintiffs allege. Thus being there and seeing the offending conduct does not confer standing.

*Barnes-Wallace*, 530 F.3d at 795. In other words, the point of *Valley Forge* is that psychological injury does not constitute a legally cognizable injury-in-fact.

Even if *Valley Forge* admits of some limited class of psychological injuries that can constitute an injury-in-fact, which I do not think it does, certainly such a class is not present in this case. Like the *Valley Forge* plaintiffs, the Breens and the

Barnes-Wallaces did not even try to use the parts of the parks that are run by the Boy Scouts. Therefore, the distinction between the two cases reduces to the allegation made by the Breens and the Barnes-Wallaces' that they *would* use the parks if the Boy Scouts were not there. As discussed above, the ease of inserting such an allegation into a future complaint makes that distinction meaningless.

IV

The majority also bases its conclusions on our "giant cross" cases, which involved challenges to large, visible crosses on public land. *See Buono v. Norton*, 371 F.3d 543, 546-47 (9th Cir. 2004) (cert. pending); *Ellis v. La Mesa*, 990 F.2d 1518, 1523 (9th Cir. 1993). *Buono* involved a cross on federally-owned property "bolted to a rock outcropping rising fifteen to twenty feet above grade and . . . visible to vehicles on the adjacent road from a hundred yards away." *Buono*, 371 F.3d at 549. In *Ellis*, there were two 36 and 43-foot tall crosses on government property and one on the city's official insignia. *Ellis*, 990 F.2d 1520. In both cases, the plaintiffs claimed that they were "deeply offended by the cross display on public land," *Buono*, 371 F.3d at 546, and were "injured due to . . . not being able to freely use public areas." *Ellis*, 990 F.2d at 1523 (internal citation and quotation marks omitted). We concluded that the plaintiffs had standing in those cases based on being offended by the presence of the crosses.

The cross cases, however, do not support the majority's analysis. First, as our sister circuits have recognized, cross and religious display cases occupy their own special corner of standing jurisprudence. *See Suhre v. Haywood County*, 131 F.3d 1083, 1086 (4th Cir. 1997) ("Religious display cases are an even more particularized subclass of Establishment Clause standing jurisprudence"). This is so because "[i]n the religious display and prayer cases, the Government . . . actively and directly communicat[es] a religious message through religious words or religious symbols — in other words, it . . . engag[es]

in religious speech that [is] observed, read, or heard by the plaintiffs." *In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008). Such "direct contact with an unwelcome religious exercise or display works a personal injury distinct from and in addition to each citizen's general grievance against unconstitutional government conduct." *Suhre*, 131 F.3d at 1086. Our cross cases have also emphasized the distinctly religious nature of the government conduct at issue. In concluding that the plaintiffs had standing to challenge the crosses in *Buono*, we held that "plaintiffs who . . . are offended by *religious displays on government property*" have standing to challenge the displays. *Buono*, 371 F.3d at 548 (emphasis added).

The outdoorsy perambulations of a bunch of Boy Scouts hardly constitute a "religious display[ ] on government property." *Id.* Indeed, there are no religious displays whatsoever on the public lands leased by the Boy Scouts. As Judge Kleinfeld put it: "Unlike a cross, neither a Boy Scout, nor the Boy Scout emblem (an eagle with a shield on a fleur-de-lis), nor a sign saying 'Boy Scouts,' is the central symbol of any religion or sexual preference." The Boy Scouts are more concerned with "knot tying . . . camping, boating, hiking, swimming, and charitable activities." *Barnes-Wallace*, 530 F.3d at 797. Judge Kleinfeld is plainly right when he says that "[a] gigantic cross on a mountaintop carries religious significance that a herd of 11 year old boys camping out and swimming does not." *Id.*

Judge Kleinfeld is also right to see

> a distinction between a prominent display of an unambiguous religious symbol on public land and groups with myriad viewpoints working with government to facilitate public use of lands. San Diego, like many municipalities, leases property to many non-profit groups: San Diego Calvary Korean Church, Point Loma Community Presbyterian Church, the Jewish Community Center, the Vietnam-

> ese Federation, the Black Police Officers Associa-
> tion, and ElderHelp. No doubt people can be found
> in San Diego who do not like Koreans, Presbyteri-
> ans, Jews, Vietnamese, Blacks, and old people, and
> who disagree with the beliefs people in these groups
> share. Their feelings of disagreement or dislike
> should not be treated as the "concrete injury" that is
> "an invasion of a legally protected interest" required
> for standing.

*Id.*

Even if the Boy Scouts *are* somehow a "religious display,"
the panel majority is still wrong. In the cross and religious
display cases, the plaintiffs came into "direct contact" with
the offensive exhibition in question; they did not launch chal-
lenges from afar. In *Buono*, for example, the plaintiff "regu-
larly [visited] the Preserve" where the cross was located.
*Buono*, 371 F.3d at 546 (internal citation and quotation marks
omitted); *Vasquez v. Los Angeles County*, 487 F.3d 1246,
1249 (9th Cir. 2007) (noting that Vasquez had "daily contact
with the revised [city] seal" (internal quotation marks omit-
ted)). Indeed, courts have vigilantly denied standing even in
religious display cases when the plaintiff did not have any
"personal contact" with the display. *See, e.g.*, *ACLU-NJ v.
Township of Wall*, 246 F.3d 258, 266 (3d Cir. 2001). Here, of
course, the Breens and the Barnes-Wallaces have not even
tried to use the lands controlled by the Boy Scouts. They have
no "direct contact" or "unwelcome personal contact" with the
Boy Scouts apart from their presence on the parts of the parks
that the Boy Scouts do not control.

Thus, the majority's order creates needless tension with
cases in our sister circuits and in our own court, which, as dis-
cussed above, require direct, personal contact with the offen-
sive religious symbol. *See, e.g.*, *Sullivan v. Syracuse Hous.
Auth.*, 962 F.2d 1101, 1107-08 (2d Cir. 1992); *ACLU-NJ*, 246
F.3d at 266 (Third Circuit); *ACLU of Ohio Found., Inc. v.*

*Ashbrook*, 375 F.3d 484, 489-90 (6th Cir. 2004) ("Davis [is] a lawyer who travels to and must practice law within DeWeese's courtroom from time to time. There, Davis has and would continue to come into direct, unwelcome contact with the Ten Commandments display."); *Saladin v. City of Milledgeville*, 812 F.2d 687, 692 (11th Cir. 1987) ("[A]t least three of the plaintiffs regularly receive correspondence on city stationery bearing the seal . . . . [T]he presence of . . . the seal offends the appellants because the seal represents the City's endorsement of Christianity."); *Vasquez*, 487 F.3d at 1249 (Ninth Circuit); *Caldwell v. Caldwell*, 2008 WL 4444310, at *4-5 (9th Cir. Oct. 3, 2008).

V

The panel majority's certification order treats standing as a nuisance to be swatted aside rather than as "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing serves a purpose in our system of government. "The power to declare the rights of individuals and to measure the authority of governments, [the Supreme Court] said 90 years ago, is legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy." *Valley Forge*, 454 U.S. at 471 (internal quotation marks omitted). By unjustifiably re-inventing the holdings of our religious display cases, the panel majority disregards these limits.

I acknowledge that those limits are not always clear and bright or easily discernible. Still, "[t]he absence of precise definitions . . . hardly leaves courts at sea in applying the law of standing." *Allen v. Wright*, 468 U.S. 737, 751 (1984). Some principles should be clear. This is one of them. A plaintiff who is psychologically injured by the mere thought of associating with people who hold different views cannot claim that he has suffered a legally cognizable injury-in-fact.

## VI

For the foregoing reasons, I respectfully dissent from our failure to rehear this case en banc.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2008 Thomson Reuters/West.