**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MITCHELL BARNES-WALLACE;
MAXWELL BREEN,
              *Plaintiffs-Appellees,*

              v.

CITY OF SAN DIEGO,
                       *Defendant,*

              and

BOY SCOUTS OF AMERICA — DESERT
PACIFIC COUNCIL,
              *Defendant-Appellant.*

No. 04-55732

D.C. No.
CV-00-01726-
NAJ/AJB

MITCHELL BARNES-WALLACE;
MAXWELL BREEN; LORI BARNES-
WALLACE, Guardian Ad Litem;
LYNN BARNES-WALLACE, Guardian
Ad Litem; MICHAEL BREEN,
Guardian Ad Litem; VALERIE
BREEN, Guardian Ad Litem,
              *Plaintiffs-Appellants,*

              v.

CITY OF SAN DIEGO; BOY SCOUTS OF
AMERICA — DESERT PACIFIC
COUNCIL,
              *Defendants-Appellees.*

No. 04-56167

D.C. No.
CV-00-01726-
NAJ/AJB

ORDER
CERTIFYING
QUESTIONS TO
THE SUPREME
COURT OF
CALIFORNIA

Filed June 3, 2010

Before: William C. Canby, Jr., Andrew J. Kleinfeld, and
Marsha S. Berzon, Circuit Judges.

## ORDER

Once again, we respectfully request the California Supreme Court to exercise its discretion and decide the certified questions presented below. *See* Cal. R. Ct. 8.548. We previously certified these questions to the California Supreme Court in an order that, in addition to certifying the questions, determined that the plaintiffs had standing to maintain this action. *Barnes-Wallace v. City of San Diego*, 530 F.3d 776 (9th Cir. 2008). We stayed our certification order pending disposition of a petition for rehearing en banc. That petition was denied on December 31, 2008, and we directed the certification order to be delivered to the California Supreme Court. *Barnes-Wallace*, 551 F.3d 891 (9th Cir. 2008). The Boy Scout defendants filed a petition for certiorari, however, challenging our certification order's ruling that the plaintiffs had standing to maintain the action. Pet. for cert., 2009 WL 888298 (Mar. 31, 2009). The Supreme Court of California then entered an order stating that our request for decision of certified questions was "denied without prejudice and may be re-filed after the issue of standing is finalized." Order, April 1, 2009 (Cal. Sup. Ct.).

Upon receipt of the order of the Supreme Court of California, we stayed further proceedings in our court pending the decision of the Supreme Court on the Boy Scouts' petition for certiorari, and the decision of the Supreme Court in *Salazar v. Buono, cert. granted,* 129 S. Ct. 1313 (2009), which raised a similar standing issue. *Barnes-Wallace*, 566 F.3d 851 (9th Cir. 2009).

On April 28, 2010, the United States Supreme Court decided *Salazar v. Buono*, 2010 WL 1687118 (U.S. Apr. 28, 2010), but a majority of the Court did not decide the relevant

standing issue because it was foreclosed by an earlier lower-court decision in the same litigation that the government did not appeal. *Salazar v. Buono*, 2010 WL at * 8 (plurality opinion). Shortly thereafter, the Supreme Court denied certiorari in *Boy Scouts v. Barnes-Wallace*, 2010 WL 1740539 (May 3, 2010).

We conclude, therefore, that the issue of standing has become finalized within the meaning of the order of the California Supreme Court of April 1, 2009. In accordance with that order, we take this opportunity to re-file our certification of issues and request for decision by the California Supreme Court. Our certification of issues remains the same as in the previous submission; the discussion of standing has been modified to reflect the developments described above.

The resolution of any one of the questions we certify could determine the outcome of this appeal and no controlling California precedent exists. *See* Cal. R. Ct. 8.548. We are aware of the California Supreme Court's demanding caseload and recognize that our request adds to that load. But we feel compelled to request certification because this case raises difficult questions of state constitutional law with potentially broad implications for California citizens' civil and religious liberties. Considerations of comity and federalism favor the resolution of such questions by the State's highest court rather than this court.

## I.   Questions Certified

The Desert Pacific Council, a nonprofit corporation chartered by the Boy Scouts of America, leases land from the City of San Diego in Balboa Park and Mission Bay Park. The Council pays no rent for the Mission Bay property and one dollar per year in rent for the Balboa Park property. In return, the Council operates Balboa Park's campground and Mission Bay Park's Youth Aquatic Center. The campground and the Aquatic Center are public facilities, but the Council maintains

its headquarters on the campground, and its members extensively use both facilities. The Boy Scouts of America — and in turn the Council — prohibit atheists, agnostics, and homosexuals from being members or volunteers and require members to affirm a belief in God.

The plaintiffs are users of the two Parks who are, respectively, lesbians and agnostics. They would use the land or facilities leased by the Desert Pacific Council but for the Council's and Boy Scouts' discriminatory policies.

We certify to the California Supreme Court the following questions:

1. Do the leases interfere with the free exercise and enjoyment of religion by granting preference for a religious organization in violation of the No Preference Clause in article I, section 4 of the California Constitution?

2. Are the leases "aid" for purposes of the No Aid Clause of article XVI, section 5 of the California Constitution?

3. If the leases are aid, are they benefitting a "creed" or "sectarian purpose" in violation of the No Aid Clause?

The California Supreme Court is not bound by this court's presentation of the questions. We will accept a reformulation of the questions and will accept the Supreme Court's decision. To aid the Supreme Court in deciding whether to accept the certification, we provide the following statement of facts, jurisdictional statement, and explanation.

## II.   Statement of Facts

Because the district court granted summary judgment against it, we take the facts in the light most favorable to the

non-moving party, the Desert Pacific Council. *See Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

## A.   The Parties

The Desert Pacific Council (the "Council") is a nonprofit corporation chartered by The Boy Scouts of America to administer Scouting programs in the San Diego area. Congress chartered the Boy Scouts of America "to promote . . . the ability of boys to do things for themselves and others . . . and to teach them patriotism, courage, self-reliance, and kindred virtues." 36 U.S.C. § 30902 (2006). While Scouting focuses primarily on outdoor activity, the Boy Scouts' rules include a prohibition against allowing youths or adults who are atheists, agnostics, or homosexuals to be members or volunteers. *Cf. Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659-61 (2000) (holding that the Boy Scouts have a constitutional right to exclude homosexuals). These rules bind the Council. The Boy Scouts maintain that agnosticism, atheism, and homosexuality are inconsistent with their goals and with the obligations of their members. *See Randall v. Orange County Council, Boy Scouts of Am.*, 17 Cal. 4th 736, 742 (1998) (reciting that, in defending its right to exclude atheists, the Boy Scouts introduced "evidence intended to establish that requiring the inclusion of nonbelievers . . . would interfere with the organization's efforts to convey its religious message").

The Boy Scouts do not require scouts to affiliate with any religious organization, and the Boy Scouts style themselves "absolutely nonsectarian." [ER 309 (75:7-8), 1580, art. IX § 1, cl. 1; *see also, e.g.*, ER 1527; ER 54 ¶ 185, ER 2007 ¶ 185.][1]

---

[1]The bracketed citations of ER and SER refer, respectively, to the Excerpts of Record and the Supplemental Excerpts of Record filed by the parties in this court. The references are included in this Order for the convenience of the California Supreme Court, should it choose to request this court to furnish those Excerpts. *See* Cal. R. Ct. 8.548(c).

The San Diego Boy Scouts are "not a house of worship like a church or synagogue." [ER 54 ¶ 185; ER 2007 ¶ 185.] Still, the organization has a religious element. All members and volunteers take an oath to "do my best . . . [t]o do my duty to God and my country" and to remain "morally straight." [ER 2005 ¶ 176.] The organization's mission is "to prepare young people to make ethical choices over their lifetimes by instilling in them the values of the Scout Oath and Law." [ER 2003 ¶ 162.] Duty to God is placed first in the Oath as "the most important of all Scouting values." [ER 2004 ¶ 170.] Members also must agree to uphold the "Scout Law," which provides that a Scout is "faithful in his religious duties." [ER 2005 ¶ 177.] Membership and leadership applications contain a "Declaration of Religious Principle," which explains that "no member can grow into the best kind of citizen without recognizing an obligation to God." [ER 1535.] The Boy Scouts instruct leaders to "be positive in their religious influence and [to] encourage Scouts to earn the religious emblem of their faith." [ER 1527.]

The plaintiffs Barnes-Wallaces are a lesbian couple and the plaintiffs Breens are agnostics. Because of their sexual and religious orientations, they cannot be Boy Scout volunteers. Both couples have sons old enough to join the Boy Scouts, and they would like their sons to use the leased facilities, but the parents refuse to give the approval required for membership. As part of the membership application, a parent must promise to assist his or her son "in observing the policies of the Boy Scouts of America . . . [to] serve as his adult partner and participate in all meetings and approve his advancement." [*Id.* 1533.] The application also includes the Scout Law and the Declaration of Religious Principle. The Barnes-Wallaces and the Breens believe that the Boy Scouts' policies are discriminatory, and they refuse to condone such practices by allowing their children to join the Boy Scouts.

## B.   The Leases

In accord with its long history of "encourag[ing] nonprofit organizations to develop cultural, educational, and recreational programs" on the City property, the plaintiffs' home town of San Diego has leased 123 public properties to various nonprofit organizations.[2] [SER 10, 36.] One of these organizations is the Desert Pacific Council, which leases, occupies, and operates portions of two popular city parks. Other portions of those parks are extensively used by the plaintiff families. Under the original lease, the Council paid one dollar per year in rent. In 2002 the parties entered into a new twenty-five-year lease, which requires the Desert Pacific Council to pay one dollar in annual rent and a $2,500 annual administration fee.

The City negotiated this lease with the Council on an exclusive basis, as it sometimes does with groups, religious or secular, that it deems to be appropriate operators of a particular piece of City property. [ER 843-44, 850 (132:8-23); SER 433-34, 592 (135:7-20), 1168, 1172-73, 1175, 1182-83, 1185-86, 1189.] Other organizations receive similar terms. Some ninety-six of the City's leases to non-profits (including nineteen leases to youth-oriented recreational non-profits) require no rent or rent less than the $2,500 fee the Council pays, and fifty of them have terms twenty-five years or longer. [SER 12-15, 27-29.] Although they produce little to no revenue, these leases save the City some money by placing the costs of maintenance and improvement upon the lessee organiza-

---

[2]These organizations include religious organizations (e.g., San Diego Calvary Korean Church, Point Loma Community Presbyterian Church, Jewish Community Center, Salvation Army), organizations concerned with children or the elderly (e.g., Camp Fire, Girl Scouts, ElderHelp, Little League), organizations that limit their membership or services on the basis of race or ethnicity (e.g., Vietnamese Federation of San Diego, Black Police Officers Association), and art museums and similar institutions (e.g., San Diego Art Institute, Old Globe Theater) [SER 11, 14, 27-29].

tions. [SER 204-05.] The City spends nothing on the properties leased to the Council. [SER 3 ¶ 9, 5 ¶ 17.]

The Council leases from the City sixteen acres in Balboa Park known as Camp Balboa. Camp Balboa offers a "unique" urban camping opportunity in the "heart of the City." [ER 1966 ¶ 7.] The site includes campgrounds, a swimming pool, an amphitheater, a program lodge, a picnic area, a ham radio room, restrooms and showers, and a camp ranger office. The lease requires the Council to maintain the property and to expend at least $1.7 million for capital improvements over seven years. [ER 820.] The Boy Scouts have landscaped, constructed recreational facilities, and installed water and power on the property. [SER 217 ¶ 17.]

Similarly, under the Fiesta Island lease, the Boy Scouts spent approximately $2.5 million to build the Youth Aquatic Center [SER 215 ¶ 10, 1084 ¶ 19]. The facility offers the use of kayaks, canoes, sail and row boats, and classroom space to other youth groups at inexpensive rates. [SER 215-16 ¶¶ 10-11.]

## C.   Occupancy of the Land

The Desert Pacific Council makes exclusive use of portions of Balboa Park for its own benefit. The Council has its headquarters on park property. From this facility it oversees its $3.7 million budget, manages its thirty employees, and processes applications for membership and leadership positions. The Council also has a print shop on park land that it uses to print literature for its members. These portions of the park are unavailable for public use.

Other portions of Camp Balboa and the Youth Aquatic Center are available for use by non-member groups, but the Council manages reservations of these recreational facilities. Campsites at Camp Balboa are available on a first-come, first-served basis. [SER 295, 307, 617-18.] Thus, if the plaintiffs

were to use the land, they would have to do so subject to the Council's oversight. The Council can declare the camp "closed," determine how many people are going to attend the camps, and then open up only the unreserved facilities to the public. Nonetheless, numerous other groups have camped in the campsites while camp was in session, and the San Diego Boy Scouts have not turned any non-Scout group away from Camp Balboa during that time. [SER 291 (171:3-6); *see also* SER 624 (156:16-157:16); 291 (170:13-15)]. The Camp charges a small fee for camping, but the revenue from fees is insufficient to cover the cost of maintaining the camp facilities. [SER 218].

The Council also leases land from the City on Fiesta Island in Mission Bay Park. In 1987, the City entered into a twenty-five-year, rent-free lease with the Desert Pacific Council for one-half acre of waterfront property on Fiesta Island. The City entered into this lease after the Desert Pacific Council approached it about building and operating an aquatic center on the island. The Council was awarded the lease on the condition that it expend $1.5 million to build the Youth Aquatic Center. At a cost of about $2.5 million [SER 1084 ¶ 19], the Council built and now operates the Aquatic Center, which offers boating, sailing, canoeing, and kayaking to San Diego youth.

As at Camp Balboa, reservations to use the Youth Aquatic Center are made through the Council. The Aquatic Center has a formal first-come, first-served policy, but the policy has exceptions for Scout members. The Desert Pacific Council is permitted to reserve up to 75% of the facilities seven days in advance. The Council also hosts a members-only camp for four weeks each summer. The reservation books during camp say "YAC Closed for Summer Camp," although the Boy Scouts' use of the Aquatic Center during those weeks is not exclusive. [SER 216-17, 317.] While the public cannot use the Aquatic Center during summer camp for water-based activities, it can reserve dormitories or other facilities the Scouts

are not using. In practice, non-members often use portions of the facilities more than members do. [SER 216-18.] The San Diego Boy Scouts have not turned away any non-Scout group while Scouting is in session, either at Camp Balboa or at the Aquatic Center. [SER 291 (170:13-15, 171:3-6), 315 (227:11-14).] The Center charges fees for use, but there is no evidence that the fees equal or exceed the cost of maintaining the facilities.

There are no religious symbols either at Camp Balboa or at the Youth Aquatic Center.

### D. The Plaintiffs' Injury

The plaintiffs never applied to use the Youth Aquatic Center or Camp Balboa; there is no evidence that the Council actively excluded them. [SER 235-36 (104:24-106:10), 244 (91:25-93:23), 251-52 (33:2-35:10).] Rather, they testified that the Council's occupation and control of the land deterred them from using the land at all. The plaintiffs desired to make use of the recreational facilities at Camp Balboa and the Youth Aquatic Center, but not under the Council's authority. As a result, they actively avoided the land. They refused to condone the Boy Scouts' exclusionary policies by seeking permission from the Boy Scouts to use the leased facilities or by using the leased facilities subject to the Boy Scouts' ownership and control. [ER 85, 370-71; SER 252 (35:12-15; 36:2-5).] They had an aversion to the facilities and felt unwelcome there because of the Boy Scouts' policies that discriminated against people like them. [ER 369; SER 254 (74:4-10)].

The plaintiff families brought this action against the City of San Diego, the Boy Scouts, and the Desert Pacific Council, alleging that leasing public land to an organization that excludes persons because of their religious and sexual orientations violates the federal Establishment Clause, the California Constitution's No Preference[3] and No Aid[4] Clauses, the fed-

---

[3]This Clause provides, in relevant part:

Free exercise and enjoyment of religion without discrimination or

eral and state Equal Protection Clauses, the San Diego Human Dignity Ordinance, and state contract law. The district court found the plaintiffs had standing as municipal taxpayers and then allowed them to file an amended complaint. Both parties sought summary judgment. The court found that the leases violated the federal Establishment Clause and the California No Aid and No Preference Clauses and granted summary judgment in the plaintiffs' favor. *Barnes-Wallace v. Boy Scouts of Am.*, 275 F. Supp. 2d 1259, 1276-80 (S.D. Cal. 2003). In the amended final judgment, the court enjoined the Balboa Park and Fiesta Island leases. The City then notified the Council that under the terms of the 2002 Balboa Park lease, the term tenancy was terminated and converted to a month-to-month tenancy. The plaintiffs have since settled with the City. The Scout defendants appealed the district court's ruling.

## III.   Jurisdiction

We have statutory jurisdiction over this appeal under 28 U.S.C. § 1291, but the parties presented challenges to the existence of a case or controversy that is essential to our constitutional jurisdiction under Article III. *See Harrison W. Corp. v. United States*, 792 F.2d 1391, 1392 (9th Cir. 1986).

---

preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion.

Cal. Const. art. I, sec. 4.

[4]This Clause states:

Neither the legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose. . . .

Cal. Const. art. XVI, sec. 5.

We ruled on those challenges in our prior certification order, *Barnes-Wallace v. City of San Diego*, 530 F.3d 776 (9th Cir. 2008). First, we held that the City's termination of the Balboa Park Lease did not moot that controversy because the Desert Pacific Council still retained a month-to-month tenancy, and because the termination itself was contingent on the outcome of this appeal. *Id.* at 783-84. Second, we held that the plaintiffs had standing to maintain this action because they suffered an injury-in-fact caused by the Boy Scouts' activities. *Id.* at 784-86. En banc review of that standing decision was denied, 551 F.3d 891 (9th Cir. 2008), and the Supreme Court denied certiorari, 2010 WL 1740539 (U.S. May 3, 2010). Thus the challenges to this court's jurisdiction have been rejected, and we proceed with this certification and request for decision.

## IV.    Explanation of Certification

### 1.    The Need to Avoid Federal Constitutional Questions

"[F]ederal courts should not decide federal constitutional issues when alternative grounds yielding the same relief are available." *See Kuba v. 1-A Agric. Assoc.*, 387 F.3d 850, 856 (9th Cir. 2004). If the California Constitution provides an independent basis for relief, then there is "no need for decision of the federal issue." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 295 (1982). Yet any interpretation by this court of the State's constitutional clauses, unlike an interpretation by the California Supreme Court, cannot be authoritative. *See Bartoni-Corsi Produce, Inc. v. Wells Fargo Bank, N.A.* (*In re Bartoni-Corsi Produce, Inc.*), 130 F.3d 857, 861 (9th Cir. 1997).

### 2.    The Need for Certification

We certify three issues to the California Supreme Court because they require interpretation of the state constitution's

religion clauses beyond that found in state or federal cases. These clauses affect the delicate relationship between the government and religion, and any interpretation of these clauses has significant public policy ramifications.

### a.   The No Preference Clause

The No Preference Clause states in part that "[f]ree exercise and enjoyment of religion without discrimination or preference are guaranteed." Cal. Const. art. 1 § 4. The California Supreme Court "has never had occasion to definitively construe" this clause. *E. Bay Asian Local Dev. Corp. v. California*, 24 Cal. 4th 693, 719 (2000). Having not yet been faced with a case that requires it "to declare the scope and proper interpretation" of the clause, it has found no necessity to set the boundaries of the clause. *See Catholic Charities of Sacramento, Inc. v. Superior Court*, 32 Cal. 4th 527, 562 (2004). We therefore cannot accurately estimate from existing California Supreme Court cases how that Court would apply the No Preference Clause to the case before us. It is true that, in a case involving exemptions from a landmark preservation law for religious institutions, the California Supreme Court held that, because the challenged action passed the federal Establishment Clause test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), it also complied with California's No Preference Clause. *E. Bay Asian Local Dev. Corp.*, 24 Cal. 4th at 719; *see also Paulson v. Abdelnour*, 145 Cal. App. 4th 400, 434 (2006). It is not at all clear, however, whether the Boy Scouts' management of the park facilities complies with the *Lemon* test, and we follow the rule of not deciding federal constitutional questions when state law may be determinative. We know of no authority compelling the California courts to address the *Lemon* test in every challenge brought under the No Preference Clause. Any independent determination of a No Preference Clause issue by the California Supreme Court would be conclusive on this court and this litigation.

Although state intermediate appellate courts have construed the No Preference Clause, the unique facts of this case would

require us to go beyond these decisions. *See, e.g., DiLoreto v. Board of Educ.*, 74 Cal.App.4th 267, 278, 87 Cal.Rptr.2d 791, 798-99 (1999); *Woodland Hills Homeowners Org. v. Los Angeles Cmty. Coll. Dist.*, 218 Cal. App. 3d 79, 93-95 (1990); *Okrand v. City of Los Angeles*, 207 Cal. App. 3d 566, 571-72 (1989); *Bennett v. Livermore Unified Sch. Dist.*, 193 Cal. App. 3d 1012, 1016, 1024 (1987); *Feminist Women's Health Ctr., Inc. v. Philibosian*, 157 Cal. App. 3d 1076, 1092 (1984). For example, the plaintiff families challenge the process by which the leases were obtained, but no California court has identified the perspective from which we should scrutinize these processes to determine whether there has been a forbidden preference. The United States Supreme Court adopts the perspective of a reasonable observer when determining Establishment Clause questions, *see County of Allegheny v. ACLU, Greater Pittsburgh Chapter,* 492 U.S. 573, 635 (1989) (O'Connor, J., concurring in part and concurring in the judgment), but at least one Justice of the California Supreme Court has urged that courts interpreting the No Preference Clause "view the issue from the perspective of the minority." *Sands v. Morongo Unified Sch. Dist.*, 53 Cal. 3d 863, 915-16 (Cal. 1991) (Arabian, J., concurring). Thus, we seek certification so that the California Supreme Court, rather than this federal court, can chart the proper course through these unresolved areas.

### b.    The No Aid Clause

The absence of controlling precedent in regard to the No Aid Clause presents us with an even greater problem, in part because that clause is without a parallel in the United States Constitution. The No Aid Clause prohibits the City from "mak[ing] an appropriation, or pay[ing] from any public fund whatever, or grant[ing] anything to or in aid of any religious sect, church, creed, or sectarian purpose . . . ." Cal. Const. art. XVI § 5. To assess whether the leases violate the No Aid Clause, we must determine whether the leases are aid and, if so, whether the City supports a creed or sectarian purpose by

granting the aid to the Boy Scouts. The California Supreme Court has not been called upon to define "aid" in a manner that applies to the circumstances of this case. Nor has it been required to establish what is a "creed" or "sectarian purpose" to which aid cannot be given.

In its most recent decision construing the No Aid Clause, *California Statewide Communities Development Auth. v. All Persons Interested in Validity of a Purchase Agreement*, 152 P.3d 1070 (Cal. 2007), the California Supreme Court held that the clause did not invalidate a public bond program that facilitated the raising of private money to benefit sectarian institutions. *Id.* at 1081. It had long been established that such aid could be given to religiously affiliated colleges so long as the funds were not used for religious purposes. The question for decision in *Statewide Communities* was whether the same rule applied to institutions that were "pervasively sectarian." *Id.* at 1072. No definition of "pervasively sectarian" was required, because the parties assumed for purposes of the case that the institutions in question were pervasively sectarian. *Id.* For the same reason, it was unnecessary to define precisely a "creed" or "sectarian purpose." The bond arrangement was held not to violate the No Aid Clause so long as the institutions did not use the bond proceeds for sectarian purposes and met certain other requirements, including the offering of a sufficiently broad curriculum of secular subjects. *Id.* at 1077, 1081. The *Statewide Communities* decision does not assist us, however, in determining whether the City's leases to the Boy Scouts violate the No Aid Clause, because the California Supreme Court emphasized that no public funds or real estate passed to the sectarian institutions. *Id.* at 1076. *Statewide Communities* therefore does not affect the need for certification in this case. The decision of the California Court of Appeal in *Paulson v. Abdelnour*, 145 Cal.App.4th at 434-37, 51 Cal.Rptr.3d at 601-03, is also distinguishable because it involved a transfer of land and a monument to the federal government, totally divesting the city of any control of any kind over the property.

The facts of this case also require us to go beyond the framework set forth in our own decision of *Paulson v. City of San Diego*, 294 F.3d 1124 (9th Cir. 2002) (en banc), for interpreting the No Aid Clause. *Paulson* concerned a No Aid Clause challenge to a municipal government's sale of public land containing a cross to a sectarian organization. *Paulson* concluded that the No Aid Clause "prohibits the government from (1) granting a benefit in any form (2) to any sectarian purpose (3) regardless of the government's secular purpose (4) unless the benefit is properly characterized as indirect, remote, or incidental." *Id.* at 1131. Whether the City granted a benefit to the Scout defendants for the advancement of a creed or sectarian purpose is a very different and more challenging question than that presented in *Paulson*. Resolution of this issue would require expanding our interpretation of California cases. An expansion or contraction of the definitions of "aid," "creed," or "sectarian purpose" could have a substantial impact upon Californians' liberties and the administration of their public lands. We are reluctant to embark on a refinement of the meaning of those terms without the authoritative assistance of the California Supreme Court. We thus ask that Court to exercise its discretion and decide whether the leases are aid and whether this aid benefits a creed or sectarian purpose.

## V.    Administrative Information

If our request for decision is granted, we designate the Barnes-Wallaces and the Breens to be deemed petitioners. The names and addresses of counsel for Lori, Lynn, and Mitchell Barnes-Wallace and Michael, Valerie, and Maxwell Breen are:

> David Blair-Loy
> Elvira Cacciavillani
> ACLU Foundation of San Diego & Imperial Counties
> P.O. Box 87131
> San Diego, CA 92138-7131

Mark W. Danis
M. Andrew Woodmansee
Morrison & Foerster, LLP
12531 High Bluff Drive Suite 100
San Diego, CA 92130-2040

M. E. Stephens
Stock Stephens, LLP
110 West C Street Suite 1810
San Diego, CA 92101

The names and addresses of counsel for Boy Scouts of America and the Desert Pacific Council, Boy Scouts of America are:

George A. Davidson
Carla A. Kerr
Hughes, Hubbard & Reed
1 Battery Park Plaza
New York, NY 10004

Charles Avrith
Alicia Mew
Hughes, Hubbard & Reed
350 S. Grand Ave. 36th Floor
Los Angeles, CA 90071-3442

Scott H. Christensen
Hughes, Hubbard & Reed
1775 I Street, N.W.
Washington, DC 20006-5040

As required by California Rules of Court 8.548(c) and (d), the Clerk of this Court shall submit copies of all relevant briefs and an original and ten (10) copies of this Order to the Supreme Court of California with a certificate of service on the parties.

## VI.   Stay and Withdrawal from Submission

All further proceedings in this case in this court are stayed. This case is withdrawn from submission until further order of this court. The parties shall notify the Clerk of this Court within one week after the California Supreme Court accepts or rejects certification and, if that Court accepts certification, again within one week after that Court renders an opinion.

---

KLEINFELD, Circuit Judge, concurring:

I continue to dissent from the portion of the order filed on June 11, 2008 holding that the plaintiffs have standing for Article III purposes. My view stated in my dissent to that order is that they do not.

Without standing, there is no federal jurisdiction, and thus no authority to certify. However, assuming that there is standing, I concur in the order certifying questions to the California Supreme Court.